IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| IOANNIS MYLONAKIS, | § |
| | § |
| Plaintiff, | § |
| | § |
| v. | § |
| | § |
| THE M/T GEORGIOS M., her | § |
| engines, tackle, etc., *in rem*; | §   CIVIL ACTION NO. H-10-3031 |
| STYGA COMPANIA NAVIERA S.A.; | § |
| HELFORD MARINE INC.; | § |
| KYRIAKOS MAMIDAKIS; | § |
| NIKOLAOS A. MAMIDAKIS; | § |
| ALEXANDROS N. MAMIDAKIS; and | § |
| ALEXANDROS G. PROKOPAKIS, | § |
| | § |
| Defendants. | § |

**MEMORANDUM OPINION AND ORDER**

Plaintiff brings this action against defendants, M/T Georgios M., her engines, tackle, etc., in rem ("the Vessel"); STYGA Compania Naviera S.A. ("STYGA"), Helford Marine Inc. ("Helford"), Kyriakos Mamidakis, Emmanuel A. Mamidakis, Nikolaos A. Mamidakis, Alexandros N. Mamidakis (collectively, "the Mamidakis Defendants"), and Alexandros G. Prokopakis, for violation of the Act to Prevent Pollution from Ships ("APPS"), 33 U.S.C. § 1910, general maritime claims for unseaworthiness, negligence, intentional misrepresentation, breach of the duty to defend, maintenance and cure, double wages under 46 U.S.C. § 10313, and pendent state law claims for malicious prosecution, breach of fiduciary duty, and gross negligence. Plaintiff seeks statutory

civil penalties and attorney's fees for his APPS claims and seeks compensatory and exemplary damages for his other claims. Pending before the court are plaintiff's Emergency Motion to Sanction Certain Defendants for Perjured Deposition Testimony (Docket Entry No. 79); Defendant Nikolaos A. Mamidakis' Amended Motions to Dismiss for Lack of Personal Jurisdiction and Improper Venue (Docket Entry No. 88); STYGA Compania Naviera S.A. and Helford Marine Inc.'s Amended Motions to Dismiss for Lack of Personal Jurisdiction and Improper Venue (Docket Entry No. 89); Defendant Kyriakos Mamidakis' Amended Motions to Dismiss for Lack of Personal Jurisdiction and Improper Venue (Docket Entry No. 90); Alexandros G. Prokopakis's Amended Motion to Dismiss for Lack of Personal Jurisdiction and Improper Venue (Docket Entry No. 91); Defendant Emmanouil A. Mamidakis' Amended Motions to Dismiss for Lack of Personal Jurisdiction and Improper Venue (Docket Entry No. 92); and Defendant Alexandros N. Mamidakis' Amended Motions to Dismiss for Lack of Personal Jurisdiction and Improper Venue (Docket Entry No. 93); Defendants' Amended Motion for Partial Summary Judgment on Plaintiff's Claims Under 33 U.S.C. § 1910 a/k/a Act to Prevent Pollution from Ships (Docket Entry No. 94); Defendants' Amended Motion for Partial Summary Judgment on Plaintiff's Claims for Maintenance & Cure and Penalty Wages Under 46 U.S.C. § 10313 (Docket Entry No. 95); Defendants' Amended Motion for Partial Summary Judgment on Plaintiff's Claim of Malicious Prosecution Under Texas Law (Docket Entry No. 96); Defendants'

Amended Motion for Partial Summary Judgment on Plaintiff's Claim for Breach of the Duty to Defend (Docket Entry No. 97); and Defendants' Objections to Evidence Offered by Plaintiff (Docket Entry No. 115).

For the reasons explained below, Plaintiff's Emergency Motion to Sanction Certain Defendants for Perjured Deposition Testimony (Docket Entry No. 79) will be denied as to the individuasl defendants and granted in part and denied in part as to the corporate defendants; STYGA and Helford's Amended Motions to Dismiss for Lack of Personal Jurisdiction and Improper Venue (Docket Entry No. 89) will be granted in part and denied in part; and the Mamidakis Defendants' Amended Motions to Dismiss will be granted for lack of personal jurisdiction and moot as to improper venue (Docket Entry Nos. 88, 90-93). Defendants' Amended Motion for Partial Summary Judgment on Plaintiff's Claims Under 33 U.S.C. § 1910 a/k/a Act to Prevent Pollution from Ships (Docket Entry No. 94) will be granted; Defendants' Amended Motion for Partial Summary Judgment on Plaintiff's Claims for Maintenance & Cure and Penalty Wages Under 46 U.S.C. § 10313 (Docket Entry No. 95) will be denied; Defendants' Amended Motion for Partial Summary Judgment on Plaintiff's Claim of Malicious Prosecution Under Texas Law (Docket Entry No. 96) will be granted; Defendants' Amended Motion for Partial Summary Judgment on Plaintiff's Claim for Breach of the Duty to Defend (Docket Entry No. 97) will be granted; and Defendants' Objections to Evidence Offered by Plaintiff (Docket Entry No. 115) will be declared moot.

## I. **Factual Background**

Plaintiff is a citizen and resident of Greece.[1]  On or about November 24, 2008, in Athens, Greece, plaintiff entered into a Seaman's Contract of Employment with STYGA.[2]  From November 29, 2008, to March 1, 2009, plaintiff served as Chief Engineer onboard the M/T GEORGIOS M.,[3] a merchant vessel registered in Malta.[4]  At all times material to this action the M/T GEORGIOS M. was owned by Helford, a business entity organized under the laws of Liberia that did not have a regular place of business in Texas.[5]  At all times material to this action STYGA was a business entity organized under the laws of Panama that managed and operated the M/T GEORGIOS M.

---

[1] Original Verified Complaint, Docket Entry No. 1, p. 2 ¶ 1.

[2] STYGA and Helford's Reply to Plaintiff Mylonakis' Response to STYGA and Helford's Motions to Dismiss for Lack of Personal Jurisdiction and Improper Venue, Docket Entry No. 121, p. 1.

[3] Original Verified Complaint, Docket Entry No. 1, p. 9 ¶ 28.

[4] Id. at 2 ¶ 2.

[5] Id. at 2-3 ¶ 4 (Plaintiff alleges in his Original Verified Complaint that Helford is organized under the laws of Malta, but elsewhere plaintiff states that Helford is "a Liberian offshore company."  See Plaintiff's Opposition to Defendants' Amended Motions to Dismiss for Lack of Personal Jurisdiction and Improper Venue ("Plaintiff's Opposition to STYGA and Helford's Amended Motions to Dismiss"), Docket Entry No. 106, p. 2.).  See also Declaration of Emmanouil A. Mamidakis as Corporate Representative of Helford Marine, Inc., Exhibit 1 to STYGA Compania Naviera S.A. and Helford Marine Inc.'s Amended Motions to Dismiss for Lack of Personal Jurisdiction and Improper Venue ("STYGA and Helford's Amended Motions to Dismiss"), Docket Entry No. 89, p. 1 ¶ 2 (Helford organized under laws of Liberia), p. 2 ¶ 5 (Helford is registered owner of the M/T GEORGIOS M.), and p. 3 ¶ 17 (listing Helford's lack of certain contacts with Texas).

for Helford and did not have a regular place of business in Texas.[6]

Plaintiff alleges that the "MAMIDAKIS DEFENDANTS were the beneficial owners and persons who controlled HELFORD, STYGA, and the M/T GEORGIOS M."[7] Defendants acknowledge that

> [d]efendant Kyriakos Mamidakis, a resident citizen of Greece, was the President and a member of the Board of Directors of both STYGA and Helford. (*See* Decl. of Kyriakos Mamidakis, attached hereto as Ex. 3, at ¶¶ 2 and 11.) Defendant Emmanouil A. Mamidakis, a resident citizen of Greece, was the Treasurer and a member of the Board of STYGA and Helford. (*See* Decl. of Emmanouil A. Mamidakis, attached hereto as Ex. 4, at ¶¶ 2 and 12.) Defendant Nikolaos A. Mamidakis, a resident citizen of Greece was the Vice President of STYGA and a member of the board of directors of STYGA. (*See* Decl. of Nikolaos A. Mamidakis, attached hereto as Ex. 5, at ¶¶ 2 and 11.) Defendant Alexandros N. Mamidakis, a resident citizen of Greece, was a member of the board of directors of STYGA. (*See* Decl. of Alexandros N. Mamidakis, attached hereto as Ex. 6, at ¶¶ 2 and 11.) Defendant Alexandros G. Prokopakis, a resident of Greece and a citizen of the United States, was the Secretary of Helford and a member of the board of directors of both STYGA and Helford. (*See* Decl. of Alexandros G. Prokopakis, attached hereto as Ex. 7, at ¶¶ 2 and 7.)[8]

On or about November 29, 2008, plaintiff arrived at Puerto Limon, Costa Rica, to board the M/T GEORGIOS M. and replace Argyrios Argyropoulos ("Argyropoulos") as Chief Engineer.[9]

---

[6]*Id.* at 2 ¶ 3. See also Declaration of Emmanouil A. Mamidakis as Corporate Representative of STYGA Compania Naviera S.A., Exhibit 2 to STYGA and Helford's Amended Motions to Dismiss, Docket Entry No. 89, p. 1 ¶ 2 and p. 2 ¶ 12.

[7]*Id.* at 9-10 ¶ 28.

[8]STYGA and Helford's Amended Motions to Dismiss, Docket Entry No. 89, p. 3.

[9]Original Verified Complaint, pp. 23-24 ¶ 69.

On February 19, 2009, at the port of Texas City, Texas, the United States Coast Guard (USCG) initiated an investigation into alleged unlawful discharges of oily waste from the M/T GEORGIOS M. This investigation caused the United States to file criminal charges against STYGA as manager and plaintiff as Chief Engineer of the M/T GEORGIOS M.[10] The criminal charges arose from discovery of a bypass pipe also known as a "magic pipe" onboard the vessel used to discharge overboard engine room oily waste in violation of the International Convention for the Prevention of Pollution from Ships, known as MARPOL, and its United States codification known as the Act to Prevent Pollution from Ships (APPS), 33 U.S.C. §§ 1901, et seq.[11]

On February 25, 2009, STYGA and Helford entered into an Agreement on Security with the USCG pursuant to which the United States agreed to release the M/T GEORGIOS M. in exchange for STYGA and Helford's agreement to post a surety bond and to provide for the care, salaries, lodging, per diem and needed transportation for crew members from the M/T GEORGIOS M. — including plaintiff — who the USCG required to stay in the Southern District of Texas until the criminal investigation concluded.[12]

---

[10]Id. at 11 ¶ 33 and 13 ¶ 39.

[11]Id. at 10 ¶¶ 29-31.

[12]Agreement on Security, Exhibit 3 Attachment B to Plaintiff's Opposition to STYGA and Helford's Amended Motions to Dismiss, Docket Entry No. 106.

On August 20, 2009, a federal grand jury indicted plaintiff on two counts of violating the APPS, 33 U.S.C. § 1908(a), for failing "to maintain an Oil Record Book for the *M/T Georgios M* in which all disposals of oil residue, overboard discharges, and disposals of oily bilge waste water were required to be fully recorded."[13] The Indictment also charged the plaintiff with two counts of False Statements in violation of 18 U.S.C. § 1001(a)(2),[14] and one count of Obstruction in violation of 18 U.S.C. § 1519.[15]

On September 2, 2009, STYGA's Board of Directors resolved "[t]hat STYGA . . . is authorized to waive its right to indictment with regards to the investigation by the United States Attorney for the Southern District of Texas."[16] An Information dated October 8, 2009, charged STYGA with violating the APPS by failing "to maintain an Oil Record Book for the M/T Georgios M in which all disposals of oil residue, overboard discharges, and disposals of bilge water were required to be fully recorded."[17] The Information alleged that STYGA

---

[13]Indictment in Criminal Action H-09-492, United States v. Ioannis Mylonakis and Argyrios Argyropoulos, Exhibit 5 to Original Verified Complaint, Docket Entry No. 1, p. 5 ¶ 11.

[14]Id. at 7-8, ¶¶ 14-15.

[15]Id. at 9-10, ¶¶ 18-19.

[16]Resolutions of the Board of Directors, Exhibit 6 to Plaintiff's Opposition to STYGA and Helford's Amended Motions to Dismiss, Docket Entry No. 106.

[17]See Information, Docket Entry No. 1 in Criminal Action H-09-572, USA v. STYGA Compania Naveria, S.A., p. 5 ¶ 10.

maintained an Oil Record Book that: (1) falsely and affirmatively claimed discharges of bilge waste had been made through the use of an Oil Water Separator and that sludges had been incinerated; (2) failed to disclose overboard discharges of oily sludge and bilge waste made through bypass equipment and without the use of a properly functioning Oil Water Separator and oil monitoring equipment and incinerator; (3) failed to record all tank to tank transfers, including transfers from the bilge tank into the drain oil tank; and (4) that created the overall false and misleading impression that the vessel was being operated properly and was fully maintaining an accurate Oil Record Book:

| COUNT | ON OR ABOUT | IN THE PORT OF |
|-------|-------------|----------------|
| 1 | December 19, 2006 | Houston, Texas |
| 2 | January 15, 2009 | Corpus Christi, Texas |
| 2 | February 19, 2009 | Texas City, Texas |

All in violation of Title 33, United States Code, Section 1908(a), Title 18, United States Code, Section 2, and Title 33, Code of Federal Regulations, Section 151.25.[17]

On October 21, 2009, STYGA entered a written plea agreement with the United States pursuant to which STYGA pleaded guilty to the October 8, 2009, Information and agreed to (1) pay a criminal fine in the amount of $1,000,000.00; (2) pay an organizational community service payment in the amount of $250,000.00; (3) serve a thirty-six-(36)-month term of probation that includes as a condition of probation the implementation of an Environmental Compliance Plan (ECP); and (4) cooperate in the government's ongoing investigation and prosecution of individual crew members

---

[17]Id. at 5-6 ¶ 10.

-8-

from the M/T GEORGIOS M., including the plaintiff in this action.[18]
Attached to STYGA's Plea Agreement is a Joint Factual Statement
dated October 6, 2009, stipulating "that this Joint Factual
Statement is a true and accurate statement of the Defendant's
criminal conduct and that it provides a sufficient basis for the
Defendant's plea of guilty to Counts One, Two, and Three of the
Information in this case."[19]   The Joint Factual Statement states,
inter alia:

> 7.  From at least December 19, 2006, through
> February 19, 2009, senior engineering officers and other
> crew members aboard the *Georgios M*, including three Chief
> Engineers, acting on behalf of and for the intended
> benefit of Styga, installed and used a bypass pipe, also
> referred to as a "magic pipe" or a "magic hose,"
> consisting of a large section of metal pipe, secreted
> beneath the engine room deck plates of the ship, and
> connected to a flexible rubber hose of certain length
> with flanges at either end to bypass pollution prevention
> equipment on board the *Georgios M.*  In order for sludges
> to be discharged through the "magic hose," the ship's
> engineers removed internal components from a check valve
> in the sludge discharge system which allowed for fluid to
> flow in both directions, in contradiction of the ship's
> classification society approved piping system drawings.
>
> 8.  From at least December 19, 2006, through
> February 19, 2009, the senior engineers on board the
> *Georgios M*, including three Chief Engineers, often
> directed junior engineering crewmembers to connect the
> so-called "magic pipe" and deliberately discharged
> sludges and oily bilge wastes directly into the sea.

---

[18]Original Verified Complaint, Docket Entry No. 1, p. 11 ¶¶ 34-
35.  See also Plea Agreement, Exhibit 4 attached thereto, pp. 1-5
¶¶ 1-3, Docket Entry No. 1-6.

[19]Joint Factual Statement, Exhibit 1 to Original Verified
Complaint, Docket Entry No. 1-2, p. 14.

9. From at least December 19, 2006, through February 19, 2009, the senior engineers on board the *Georgios M* knowingly failed to make required entries in the vessel's ORB, including the fact that sludge and oily wastes were discharged through the bypass pipe directly into the ocean, circumventing the pollution prevention equipment required by MARPOL. Senior engineers also made false entries in the ORB indicating that oily wastes were processed using the vessel's pollution prevention equipment when in fact, as the engineering officers and engine room crew members well knew at the time, the equipment was not used.[20]

On April 28, 2010, at the conclusion of a trial, the plaintiff was acquitted of all the charges made against him in the indictment dated August 20, 2009.[21]

Plaintiff initiated this action on August 24, 2010, by filing his Original Verified Complaint (Docket Entry No. 1).

## II.  Motions to Dismiss for Lack of Personal Jurisdiction

Plaintiff alleges that "[a]t all times material hereto, all acts and omissions complained of occurred either within the State of Texas or had their impact within the State of Texas in this Federal judicial district."[22] Defendants argue that all of plaintiff's claims should be dismissed pursuant to Rule 12(b)(2) for lack of personal jurisdiction because

STYGA, Helford, and the Mamidakis defendants lack contacts with Texas or the United States to support

---

[20]Id. at 16-17 ¶¶ 7-9.

[21]Original Verified Complaint, Docket Entry No. 1, p. 34 ¶ 107. See Verdict, Docket Entry No. 161, in Criminal Action H-09-492, USA v. Ioannis Mylonakis.

[22]Original Verified Complaint, Docket Entry No. 1, p. 8.

-10-

either specific or general jurisdiction. To the extent
that Mylonakis' claims arise out of the Vessel's calls to
port in the United States, such calls were outside the
control of the Defendants and were isolated and sporadic
in nature.[23]

Plaintiff argues that defendants' contacts with Texas are
sufficient to support the exercise of personal jurisdiction.

## A.  Standard of Review

When a foreign defendant moves to dismiss for lack of personal
jurisdiction under Federal Rule of Civil Procedure 12(b)(2), "the
plaintiff 'bears the burden of establishing the district court's
jurisdiction over the defendant.'" Quick Technologies, Inc. v.
Sage Group PLC, 313 F.3d 338, 343 (5th Cir. 2002), cert. denied,
124 S.Ct. 66 (2003) (quoting Mink v. AAAA Development LLC, 190 F.3d
333, 335 (5th Cir. 1999)). "When the district court rules on a
motion to dismiss for lack of personal jurisdiction 'without an
evidentiary hearing, the plaintiff may bear his burden by
presenting a *prima facie* case that personal jurisdiction is
proper.'" Id. (quoting Wilson v. Belin, 20 F.3d 644, 648 (5th
Cir.), cert. denied, 115 S.Ct. 322 (1994)). "In making its
determination, the district court may consider the contents of the
record before the court at the time of the motion, including
'affidavits, interrogatories, depositions, oral testimony, or any
combination of the recognized methods of discovery.'" Id. at 344

---

[23]STYGA and Helford's Amended Motions to Dismiss, Docket Entry
No. 89, pp. 6-7.

(quoting <u>Thompson v. Chrysler Motors Corp.</u>, 755 F.2d 1162, 1165 (5th Cir. 1985)). The court must accept as true the uncontroverted allegations in the plaintiff's complaint and must resolve in favor of the plaintiff any factual conflicts. "Absent any dispute as to the relevant facts, the issue of whether personal jurisdiction may be exercised over a nonresident defendant is a question of law to be determined . . . by th[e C]ourt." <u>Ruston Gas Turbines, Inc. v. Donaldson Co., Inc.</u>, 9 F.3d 415, 418 (5th Cir. 1993). However, the court is not obligated to credit conclusory allegations, even if uncontroverted. <u>Panda Brandywine Corp. v. Potomac Electric Power Co.</u>, 253 F.3d 865, 869 (5th Cir. 2001).

## B.  Applicable Law

Exercise of personal jurisdiction over a nonresident defendant comports with federal due process guarantees when the nonresident defendant has established minimum contacts with the forum state, and the exercise of jurisdiction "does not offend 'traditional notions of fair play and substantial justice.'" <u>International Shoe Co. v. State of Washington, Office of Unemployment Compensation and Placement</u>, 66 S.Ct. 154, 158 (1945) (quoting <u>Milliken v. Meyer</u>, 61 S.Ct. 339, 343 (1940)). Once a plaintiff satisfies these two requirements, a presumption arises that jurisdiction is reasonable, and the burden of proof and persuasion shifts to the defendant opposing jurisdiction to present "a compelling case that the presence of some other considerations would render jurisdiction

-12-

unreasonable." Burger King Corp. v. Rudzewicz, 105 S.Ct. 2174, 2185 (1985). For claims arising under state law, federal courts "may assert personal jurisdiction if: (1) the state's long-arm statute applies, as interpreted by the state's courts; and (2) if due process is satisfied under the [F]ourteenth [A]mendment to the United States Constitution." Johnston v. Multidata Systems International Corp., 523 F.3d 602, 609 (5th Cir. 2008). For claims arising under federal law courts may assert personal jurisdiction over defendants who lack sufficient contacts to satisfy the due process concerns of any particular state's long-arm statute pursuant to Federal Rule of Civil Procedure 4(k)(2) when the defendant has sufficient contacts with the nation as a whole to justify the imposition of United States' law. See World Tanker Carriers Corp. v. M/V Ya Mawlaya, 99 F.3d 717, 720 (5th Cir. 1996).

Texas courts may assert personal jurisdiction "over a nonresident if (1) the Texas long-arm statute authorizes the exercise of jurisdiction, and (2) the exercise of jurisdiction is consistent with federal and state constitutional due process guarantees." Moki Mac River Expeditions v. Drugg, 221 S.W.3d 569, 574 (Tex. 2007) (citing Schlobohm v. Schapiro, 784 S.W.2d 355, 356 (Tex. 1990)). The Texas long-arm statute authorizes service of process on nonresidents "[i]n an action arising from a nonresident's business in this state." Tex. Civ. Prac. & Rem. Code § 17.043.

-13-

In addition to other acts that may constitute doing business, a nonresident does business in this state if the nonresident:

(1) contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in this state; [or]

(2) commits a tort in whole or in part in this state; or

(3) recruits Texas residents, directly or through an intermediary located in this state, for employment inside or outside this state.

Id. at § 17.042. The Texas Supreme Court has stated that "the long-arm statute's broad doing-business language allows the statute to 'reach as far as the federal constitutional requirements of due process will allow.'" Moki Mac, 221 S.W.3d at 575 (quoting Guardian Royal Exchange Assurance, Ltd. v. English China Clays, P.L.C., 815 S.W.2d 223, 226 (Tex. 1991)). See also Schlobohm, 784 S.W.3d at 357 (holding that the limits of the Texas long-arm statute are coextensive with the limits of constitutional due process guarantees).

## C. Minimum Contacts Analysis

"There are two types of 'minimum contacts:' those that give rise to specific personal jurisdiction and those that give rise to general personal jurisdiction." Lewis v. Fresne, 252 F.3d 352, 358 (5th Cir. 2001). Defendants argue that this action should be dismissed pursuant to Rule 12(b)(2) for lack of personal jurisdiction because plaintiffs have failed to carry their burden of presenting prima facie evidence that they purposefully

-14-

established "minimum contacts" with Texas that are sufficient to give rise to either "specific" or "general" jurisdiction. Plaintiff responds that the court has both specific and general jurisdiction over both the corporate and the individual defendants.[24]

### 1. General Jurisdiction

General jurisdiction "exists when a non-resident defendant's contacts with the forum state are substantial, continuous, and systematic." Johnston, 523 F.3d at 609 (citing Helicopteros Nacionales de Colombia, S.A. v. Hall, 104 S.Ct. 1868, 1872-74 (1984). "The 'continuous and systematic contacts test is a difficult one to meet, requiring extensive contacts between a defendant and a forum.'" Id. (quoting Submersible Systems, Inc. v. Perforadora Central, S.A. de C.V., 249 F.3d 413, 419 (5th Cir.), cert. denied, 122 S.Ct. 646 (2001)). "[E]ven repeated contacts with forum residents by a foreign defendant may not constitute the requisite substantial, continuous, and systematic contacts required for a finding of general jurisdiction. . ." Id. (quoting Revell v. Lidov, 317 F.3d 467, 471 (5th Cir. 2002)). Moreover, a defendant

---

[24]Plaintiff's Opposition to STYGA and Helford's Amended Motions to Dismiss, Docket Entry No. 106, p. 7; Plaintiff's Opposition to Amended Motions of Kyriakos Mamidakis; Emmanuel Mamidakis; Nikolaos A. Mamidakis; Alexandros N. Mamidakis; and AlexandrosG. Prokopakis; to Dismiss for Lack of Personal Jurisdiction and Improper Venue ("Plaintiff's Opposition to the Mamidakis Defendants' Amended Motions to Dismiss"), Docket Entry No. 107, p. 2.

may "not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts, . . . or of the 'unilateral activity of another party or third person.'" <u>Burger King</u>, 105 S.Ct. at 2183 (citations omitted). In other words, the only contacts that matter for personal jurisdiction must "result from actions by the defendant *himself* that create a 'substantial connection' with the forum state." <u>Id.</u> at 2184.

The seminal general jurisdiction case is <u>Perkins v. Benguet Consolidated Mining Co.</u>, 72 S.Ct. 413 (1952), in which the Supreme Court first articulated the idea that a court may exercise personal jurisdiction over a foreign corporation based on general business operations within the forum state. The Supreme Court upheld the district court's exercise of general personal jurisdiction in Ohio over a Philippine corporation whose president and general manager relocated to Ohio during the Japanese occupation of the Philippine Islands. While in Ohio, the president maintained a corporate office where he kept the records of the corporation, conducted director's meetings, and made all key business decisions. The corporation also distributed salary checks drawn on two Ohio bank accounts and engaged an Ohio bank to act as a transfer agent. In light of these activities the Court held that Ohio could exercise jurisdiction over the corporation because the president had "carried on in Ohio a continuous and systematic supervision of the necessarily limited wartime activities of the company." <u>Id.</u> at 419.

-16-

By contrast, in Helicopteros the Supreme Court held that the defendant's general business contacts with Texas were insufficient to support an exercise of general jurisdiction despite the fact that the defendant had purchased equipment from a company in the forum state. 104 S.Ct. at 1873-74. Over a six-year period the defendant purchased helicopters (approximately 80% of its fleet), spare parts, and accessories for more than $4 million from a Texas company; sent its prospective pilots to Texas for training; sent management and maintenance personnel to Texas for technical consultations; and received a check for over $5 million that was drawn upon a Texas bank. Nevertheless, the Court held that none of the contacts were substantial enough standing alone or taken together to support the assertion of general jurisdiction.

The Court explained that the mere purchase of goods from a state, even at regular intervals and in substantial amounts, was not enough to warrant the assertion of general jurisdiction over a non-resident on a cause of action unrelated to those purchases. Nor was the Court persuaded that the fact that the defendant sent personnel to Texas for training in connection with the purchases enhanced the nature of the contacts. Instead, the Court concluded that this was merely one aspect of the package of goods and services that the defendant had purchased. Finally, the Court concluded that the receipt of a check drawn from a Texas bank was of no consequence because the bank from which payment was made was

caused by the fortuitous "unilateral activity" of a third party. Id. The Fifth Circuit has consistently imposed the high standard set by the Supreme Court in Helicopteros when ruling on general jurisdiction issues. See, e.g., Central Freight Lines Inc. v. APA Transportation Corp., 322 F.3d 376, 381 (5th Cir. 2003) (finding no general jurisdiction even though the defendant routinely arranged and received shipments to and from Texas and regularly sent sales people to Texas to develop business, negotiate contracts, and service national accounts). In Access Telecom, Inc. v. MCI Telecommunications Corp., 197 F.3d 694, 717 (5th Cir. 1999), cert. denied, 121 S.Ct. 275 and 292 (2000), the Fifth Circuit emphasized that in order to confer general jurisdiction a defendant must have a business presence in Texas.

Application of the standards shows that none of the defendants in this action have sufficient systematic and continuous contacts with Texas to establish general jurisdiction. See also Johnston, 523 F.3d at 611 (reaffirming that a defendant must have a "business presence in Texas" before general jurisdiction will attach). As to the corporate defendants, plaintiff acknowledges that since the claims alleged against STYGA and Helford arise from their activity in this forum, "it is not necessary for Plaintiff to invoke general jurisdiction in the circumstances of this case."[25] As to the

_____

[25]Plaintiff's Opposition to STYGA and Helford's Amended Motions to Dismiss, Docket Entry No. 106, p. 19.

individual defendants, plaintiff asserts that "[t]he court has both specific jurisdiction and, arguably, general jurisdiction over the [i]ndividual [d]efendants."[26] However, plaintiff has not provided the court any basis for concluding that the individual defendants are subject to general jurisdiction. Instead, plaintiff bases his assertion of personal jurisdiction over the individual defendants on their alleged alter ego relationship to the corporate defendants, arguing that "[t]he acts and omission of the Corporate Defendants in the forum are, for this reason, the acts and omissions of the Individual Defendants."[27] Because plaintiff's assertion of personal jurisdiction over the individual defendants is based on their alter ego relationship to the corporate defendants, because plaintiff has acknowledged that "it is not necessary for Plaintiff to invoke general jurisdiction [against the corporate defendants] in the circumstances of this case,"[28] and because plaintiff has not offered any alternative basis for the assertion of general jurisdiction over the individual defendants, for the same reasons that the court has concluded that there is no basis for the exercise of general jurisdiction over the corporate defendants, the court concludes that there is no basis for the exercise of general jurisdiction over the individual defendants.

[26]Id. at 2.

[27]Id.

[28]Id. at 19.

## 2. Specific Jurisdiction

A court may exercise specific jurisdiction over a nonresident defendant if the lawsuit arises from or relates to the defendant's contact with the forum state. See Icee Distributors, Inc. v. J&J Snack Foods Corp., 325 F.3d 586, 591 (5th Cir. 2003). Specific jurisdiction exists where a defendant "purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." Burger King, 105 S.Ct. at 2183 (quoting Hanson v. Denckla, 78 S.Ct. 1228, 1239-40 (1958)). There are three parts to a purposeful availment inquiry. First, only the defendant's contacts with the forum are relevant, not the unilateral activity of another party or a third person. Second, the contacts relied upon must be purposeful rather than random, fortuitous, or attenuated. Finally, the defendant must seek some benefit, advantage, or profit by availing itself of the jurisdiction. A defendant may purposefully avoid a particular forum by structuring its transactions in such a way as to neither profit from the forum's laws nor subject itself to jurisdiction there. Moki Mac, 221 S.W.3d at 575 (citing Burger King, 105 S.Ct. at 2181-85). Since specific jurisdiction is claim specific, "[a] plaintiff bringing multiple claims that arise out of different forum contacts of the defendant must establish specific jurisdiction for each claim." See Seiferth v. Helicopteros Atuneros, Inc., 472 F.3d 266, 274 (5th Cir. 2006).

-20-

(a) The Corporate Defendants Are Subject to Specific Jurisdiction on All But One of Plaintiff's Claims

Citing <u>Asarco, Inc. v. Gelnara, Ltd.</u>, 912 F.2d 784 (5th Cir. 1990), STYGA and Helford argue that "[p]recedent [i]nvolving [c]hartered [v]essels [f]avors [d]ismissal"[29] because

[w]hen the Vessel arrived at the Port of Texas City on February 1, 2009, the Vessel was chartered to ST Shipping under a long-term time charter party agreement. . . Under this charter party, ST Shipping directed the ports of call for the vessel and Helford [and STYGA] had no control over whether the Vessel would call at U.S. ports.[30]

STYGA and Helford argue that they are not subject to specific jurisdiction because, as manager and owner, respectively, of the time-chartered vessel, they were not involved in decisions affecting the vessel's ports of call and did not direct the vessel to any specific port. STYGA and Helford rely on the Fifth Circuit's decision in <u>Asarco</u>, 912 F.2d at 784, for the proposition that a vessel's manager and owner do not purposefully avail themselves of the jurisdiction of a port of call that was chosen solely by the vessel's time-charterer.

In <u>Asarco</u> cargo was loaded in Australia and lost at sea long before the vessel ever reached Louisiana, where the plaintiff sued the owner and manager of the vessel. 912 F.2d at 785. The vessel had been time-chartered to a third party, who directed the vessel

---

[29]STYGA and Helford's Amended Motions to Dismiss, Docket Entry No. 89, p. 11.

[30]<u>Id.</u> at 13.

to carry the cargo to Louisiana.  Id.  The vessel's manager was a
Hong Kong corporation named Anglo-Eastern Management Services
Limited ("Anglo-Eastern").  Id.  Anglo-Eastern and the vessel's
owner successfully argued to the Louisiana district court that it
lacked personal jurisdiction over them.    The  Fifth  Circuit
affirmed, observing the general rule that "[e]ven a single,
substantial act directed toward the forum can support specific
jurisdiction," but finding that the plaintiff had failed to show
that either the vessel's owner or Anglo-Eastern had directed an act
toward Louisiana.  Id. at 786.

This case is distinguishable from Asarco.   Here, unlike
Asarco, plaintiff's claims against STYGA and Helford are not all
based on acts committed outside the forum.    Instead, Plaintiff
alleges that the two corporate defendants were responsible for the
MARPOL/APPS violations found aboard the M/T GEORGIOS M. while the
vessel was physically present in Texas, and that these defendants
and/or their agents committed other acts in Texas that harmed him.
If the nonresident corporate defendants committed the liability-
producing acts while physically present in the forum state, such
conduct will support personal jurisdiction in lawsuits arising from
those acts.

This principle is most frequently encountered in cases
involving torts committed by nonresidents while temporarily in the
State.     See Hess v. Pawloski, 47 S.Ct. 632 (1927); Elkhart
Engineering Corp. v. Dornier Werke, 343 F.2d 861, 868 (5th Cir.

1965) ("We therefor hold that Alabama may, consistent with the due process clause of the Fourteenth Amendment, assert jurisdiction over a non-resident, non-qualifying corporation in suits on a claim of liability for tortious injury arising out of activity of the non-resident within the state, even though only a single transaction is involved, and regardless of whether the activity is considered dangerous.").

Thus, if STYGA and Helford are responsible for the allegedly tortious actions of the vessel's crew while in Texas, they are subject to personal jurisdiction in Texas. See Ortega v. Seaboard Marine Ltd., 400 F.Supp.2d 987, 990 (S.D. Tex. 2005) ("Because Patt Manfield employed the captain and crew, it cannot escape litigation arising out of the allegedly tortious acts of those employees acting within the scope of their employment.").

STYGA and Helford describe their activities in Texas as follows:

> 1.    The *Georgios M* presented an Oil Record Book to the U.S. Coast Guard ("USCG") that failed to contain required entries concerning the management of sludges and oily wastes in violation of the Act to  Prevent Pollution from Ships, 33 U.S.C. §§ 1901, *et. seq.*

> 2.    On February 25, 200[9], the Defendants entered into the Agreement on Security with the U.S. Coast Guard and the United States to post a surety bond and to provide for the care, salaries, lodging, per diem and needed transportation for certain crew members from the *Georgios M* that the USCG required to be retained in this District pending the conclusion of the Government's criminal investigation in order to obtain the release of the *Georgios M* from the hold placed on it by the USCG preventing it to leave the District.

3. Following negotiations with the Department of Justice, STYGA entered into a written Plea Agreement with the United States and an attached Joint Factual Statement on October 6, 2009, which imposed certain obligations on STYGA, including the payment of the cost of the transportation to and from the Southern District of Texas and to continue to provide for the care, salaries, lodging, per diem and needed transportation of the crew members still retained pursuant to the Agreement on Security.

4. Defendants appointed an agent to perform the obligations to care for the retained crew created by the Agreement on Security and the Plea Agreement and paid for the performance of those obligations.

5. Defendants paid the fees and expenses of the Plaintiff's lead criminal defense attorney.[31]

STYGA and Helford argue that

[o]f these activities, only the presentment of the Oil Record Book containing false information can be considered as being purposefully directed at the forum or that it constituted a purposeful availment of the benefits of the laws of the forum. All of the activities following the initial assertion [of] charges were carried out under a level of compulsion and duress, and should not be considered to reach the level of activity upon which personal jurisdiction can be predicated, at least to persons, such as the Plaintiff, who were not the object of the activities.[32]

> **(1) The Corporate Defendants Are Subject to Specific Jurisdiction on Plaintiff's Claims for APPS Violations, and General Maritime Claims for Unseaworthiness, and Negligence**

STYGA and Helford's acknowledgment that while in Texas the M/T GEORGIOS M. presented an Oil Record Book to the USCG that failed to

---

[31]STYGA and Helford's Reply to Plaintiff Mylonakis' Response to STYGA and Helford's Motions to Dismiss for Lack of Personal Jurisdiction and Improper Venue, Docket Entry No. 121, p. 10.

[32]Id. at 11.

contain required entries concerning the management of sludges and oily wastes in violation of the APPS, 33 U.S.C. §§ 1901, et seq., provides a sufficient basis for the court to assert personal jurisdiction over them for plaintiff's claims that they violated the APPS. Moreover, in light of the duties that the charter party agreement imposed upon the vessel's owner, i.e., Helford, the court concludes that STYGA and Helford's acknowledgment that the vessel presented an improperly maintained Oil Record Book to the USCG in Texas also provides a sufficient basis for exercising personal jurisdiction over Helford and its agent, STYGA, for plaintiff's general maritime claims for unseaworthiness and negligence.

General maritime law imposes duties to avoid unseaworthiness, Mitchell v. Trawler Racer, Inc., 80 S.Ct. 926 (1960), and negligence, Leathers v. Blessing, 105 U.S. 626 (1881), and "nonfatal injuries caused by the breach of either duty are compensable." Norfolk Shipbuilding & Drydock Corp. v. Garris, 121 S.Ct. 1927, 1929-30 (2001) (citing Mahnich v. Southern S.S. Co., 64 S.Ct. 455, 458-59 (1944) (unseaworthiness), and Robins Dry Dock & Repair Co. v. Dahl, 45 S.Ct. 157, 158 (1925) (negligence)). The elements of an unseaworthiness claim are (1) that the defendant provided a vessel or equipment that was not reasonably fit for its intended purpose, and (2) that "the unseaworthy condition played a substantial part in bringing about or actually causing the injury and that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness." Phillips v. Western Co. of North America, 953 F.2d 923, 928 (5th Cir. 1992). To

prevail on a claim of negligence under maritime law the plaintiff must prove (1) a duty was owed by the defendant to the plaintiff, (2) the duty was breached, (3) the plaintiff suffered injury, and (4) a causal connection existed between the defendant's conduct and the plaintiff's injury. In re Great Lakes Dredge & Dock Co. LLC, 624 F.3d 201, 211 (5th Cir. 2010). "Determination of the tortfeasor's duty is a question of law and thus a function of the court. . ." Id. (quoting Mississippi Department of Transportation v. Signal International LLC, 579 F.3d 478, 490 (5th Cir. 2009)). "Under maritime law, a plaintiff is owed a duty of ordinary care under the circumstances." Id. (citing Daigle v. Point Landing, Inc., 616 F.2d 825, 827 (5th Cir. 1980)). "[A] defendant's failure to fulfill a duty of care under maritime law 'does not breach that duty, . . . unless the resultant harm is reasonably foreseeable.'" Id. at n.10 (quoting Daigle, 616 F.2d at 827).

The charter party agreement between Helford and ST Shipping requires the vessel's owner, i.e., Helford, to provide a vessel that is "in good order and condition, and in every way fit for the service,"[33] to crew the vessel,[34] to "exercise due diligence to maintain or restore the vessel,"[35] and to

---

[33]Time Charter Party, Attachment 12 to Declaration of George A. Gaitas Identifying Document Exhibits, Exhibit 2 to Plaintiff's Opposition to STYGA and Helford's Amended Motions to Dismiss, Docket Entry No. 106, ¶ 1(b).

[34]Id. ¶ 2.

[35]Id. ¶ 3(i).

> warrant that the vessel does, and will, fully comply with
> all applicable conventions, laws, regulations and
> ordinances of any international, national, state entity
> having jurisdiction including, but not limited to, the
> U.S. Port and Tanker Safety Act, as amended, the U.S.
> Federal Water Pollution Control Act, as amended, MARPOL
> 1973/1978 as amended and extended . . .[36]

In light of these provisions in the charter party agreement the

vessel's presentation of an improperly maintained Oil Record Book

to the USCG is an act that violated MARPOL and an act that can only

be attributed to Helford and/or its agent, STYGA, because the

charter party agreement required the owner, not the charterer, to

crew the vessel and to maintain the vessel in compliance with

MARPOL. It is undisputed that the presentation of an improperly

maintained Oil Record Book to the USCG not only violated MARPOL but

also occurred in Texas. It is also undisputed that the USCG's

investigation of the M/T GEORGIOS M. in Texas revealed at least one

additional MARPOL violation, i.e., the installation of a "magic

pipe" used to discharge untreated oily waste overboard.

Plaintiff's claims for unseaworthiness and negligence are both

based on allegations that STYGA and Helford failed to properly

maintain the M/T GEORGIOS M. in compliance with MARPOL.[37] The court

concludes that the requirements for exercising personal

jurisdiction over STYGA and Helford on plaintiff's claims for

unseaworthiness and negligence under maritime law are satisfied

---

[36]Id. ¶ 52.

[37]Original Verified Complaint, Docket Entry No. 1, p. 15 ¶ 44 -
p. 23 ¶ 68.

-27-

because the MARPOL violations on which these claims are based allegedly occurred in Texas by employees of Helford and/or STYGA who were acting within the scope of their employment and seeking to benefit, advantage, or profit Helford and/or STYGA by causing an improperly equipped vessel to enter a Texas port and present an improperly maintained Oil Record Book to the USCG.

### (2) The Corporate Defendants Are Not Subject to Specific Jurisdiction on Plaintiff's Claim for Intentional Misrepresentation

Plaintiff's claim for intentional misrepresentation is based on allegations that when he arrived in Costa Rica to join the M/T GEORGIOS M. as Chief Engineer the vessel's officer in charge of the engine department, Argyrios Argyropoulos, acting as the corporate defendants' agent, not only failed to disclose that the ship's International Oil Pollution Prevention Certificate and several other documents referring to the ship's machinery space arrangements and condition contained false information, but also affirmatively misrepresented to plaintiff that none of these deficiencies and non-conformities existed. Plaintiff alleges that he relied on Argyropoulos's representations and consented to take over as Chief Engineer, and that by virtue of his position as Chief Engineer he became entangled in the USCG investigation that began on or about February 19, 2009, in Texas City, Texas. Although plaintiff alleges that he discovered the defendants' misrepresentations while he and the M/T GEORGIOS M. were in Texas,

-28-

he has not alleged that any of the misrepresentations occurred in Texas. Instead, plaintiff alleges that

> [t]he non-disclosures and other affirmative misrepre-
> sentations of the Defendants occurred onboard the M/T
> GEORGIOS M at sea, and were material to Plaintiff's
> acceptance and assumption of his duties as Chief Engineer
> of the M/T GEORGIOS M, as Plaintiff relied on same
> believing that he was assuming such a post and duties
> onboard a properly and lawfully operated merchant
> vessel.[38]

Because plaintiff's allegations show that he did not join the M/T GEORGIOS M. and/or assume the position of Chief Engineer in Texas but, instead, in Costa Rica, the acts underlying the plaintiff's claim for intentional misrepresentation do not show any contact with the forum state of Texas. Accordingly, the court concludes that there is no basis on which to assert personal jurisdiction over either of the two corporate defendants on plaintiff's claim for intentional misrepresentation.

> **(3) The Corporate Defendants Are Subject to Specific Jurisdiction on Plaintiff's Claims for Breach of Duty to Defend, Maintenance and Cure, Double Wages Under 46 U.S.C. § 10313, Malicious Prosecution, Breach of Fiduciary Duty, and Gross Negligence**

Plaintiff's claims for breach of the duty to defend, maintenance and cure, double wages under 46 U.S.C. § 10313, malicious prosecution, breach of fiduciary duty, and gross negligence are based on acts and communications that occurred in

---

[38]Id. at 26 ¶ 73.

Texas as a result of the USCG's investigation and discovery of MARPOL/APPS violations onboard the M/T GEORGIOS M. Although STYGA and Helford argue that the acts and communications that occurred as a result of the USCG's investigation and discovery of MARPOL/APPS violations onboard the M/T GEORGIOS M. are insufficient to establish personal jurisdiction because those acts and communications occurred under duress, STYGA and Helford have not cited any authority in support of this argument, and the court does not find it persuasive. On the contrary, the court concludes that STYGA and Helford's acknowledgment that they entered into an Agreement on Security with the USCG and the United States that included an obligation

> to provide for the care, salaries, lodging, per diem and needed transportation for certain crew members from the *Georgios M* that the USCG required to be retained in this District pending the conclusion of the Government's criminal investigation in order to obtain the release of the *Georgios M* from the hold placed on it by the USCG preventing it to leave the District,[39]

is sufficient to establish personal jurisdiction over these defendants for claims arising from acts performed pursuant to that agreement because by entering the Agreement on Security STYGA and Helford purposely availed themselves "of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." Burger King, 105 S.Ct. at

---

[39]STYGA and Helford's Reply to Plaintiff Mylonakis' Response to STYGA and Helford's Motions to Dismiss for Lack of Personal Jurisdiction and Improper Venue, Docket Entry No. 121, p. 10.

2183.   Because plaintiff's claims for breach of duty to defend, maintenance and cure, double wages under 46 U.S.C. § 10313, malicious prosecution, breach of fiduciary duty, and gross negligence all arise from acts performed pursuant to the Agreement on Security, the court concludes that the requirements for exercising personal jurisdiction over STYGA and Helford are satisfied for these claims.

Plaintiff's breach of the duty to defend claim arises from allegations that the defendants undertook various acts in Texas in an effort to pressure plaintiff into accepting responsibility for the various MARPOL/APPS violations found to exist onboard the M/T GEORGIOS M. in Texas.[40]   Plaintiff's maintenance and cure claim arises from allegations that defendants failed to provide medical care for an illness that arose while the plaintiff was in Texas.[41] Plaintiff's claim for double wages under 46 U.S.C. § 10313 arises from allegations that STYGA and Helford failed to pay plaintiff severance pay that accrued when plaintiff was discharged from his employment while he and the vessel on which he served were in a Texas port.[42]   Plaintiff's claim for malicious prosecution arises from allegations that STYGA and Helford entered into plea bargain

---

[40]Original Verified Complaint, Docket Entry No. 1, p. 26 ¶ 76 - p. 27 ¶ 79.

[41]Id. at 28 ¶ 80 - 29 ¶ 87.

[42]Id. at 30 ¶¶ 88-93.

-31-

negotiations with the United States for the purpose of settling their exposure to criminal liability for the MARPOL/APPS violations that the USCG found onboard the M/T GEORGIOS M., and that during the course of the negotiations, these defendants agreed to blame plaintiff for the violations and agreed to cooperate with the United States by providing witnesses and documents for use in the plaintiff's criminal prosecution,[43] and that these defendants entered these agreements "even though they . . . knew or would have learned upon conducting a rudimentary investigation that [p]laintiff was never at any time involved with the MARPOL and APPS violations onboard the M/T GEORGIOS M.[44] Plaintiff's claims for breach of fiduciary duty and gross negligence arise from allegations that STYGA and Helford's plea negotiations with the United States and their dealings with him while he was detained in Houston, Texas, at the request of the United States government constitutes either an intentional breach of the fiduciary duty that an employer owes to an employee and/or gross negligence.[45] Because each of these claims arises from acts that the defendant corporations performed and/or directed to the forum state of Texas -- e.g., the termination of plaintiff's employment, the detention of the plaintiff in the Southern District of Texas pursuant to the

---

[43]Id. at 32 ¶ 96 - 34 ¶ 109.

[44]Id. at 35 ¶ 110.

[45]Id. at 36 ¶ 112 - 38 ¶ 122.

Agreement on Security that was performed in Texas, and defendants' collaboration in plaintiff's criminal prosecution in the forum -- the court concludes that STYGA and Helford each have sufficient minimum contacts with the forum for the court to assert personal jurisdiction over them.

> (b) The Mamidakis Defendants Are Not Subject to Specific Jurisdiction on Any of Plaintiff's Claim

Plaintiff bases his assertion of personal jurisdiction over the Mamidakis Defendants on an alter ego relationship to the corporate defendants, by alleging that

[j]urisdiction over Defendants KYRIAKOS, EMMANUEL, NIKOLAOS, ALEXANDROS, and PROKOPAKIS exists by virtue of intentional acts they committed in the name of Defendants STYGA and/or HELFORD who were at all times material hereto their agents and/or instrumentalities and/or *alter egos*.[47]

The Mamidakis Defendants argue that the claims asserted against them in this action are subject to dismissal for lack of personal jurisdiction and that the court should not consider the forum contacts of STYGA and Helford when deciding their challenges to personal jurisdiction. In support of this argument the Mamidakis Defendants contend that the alter ego allegations in the plaintiff's complaint are conclusory and that plaintiff is unable to adduce evidence for piercing the corporate veil.[48] In response

----

[47]Id. at 9 ¶ 25.

[48]These arguments are made in the motions to dismiss submitted by each of the five individually named Mamidakis Defendants: (continued...)

to defendants' motion to dismiss plaintiff argues that "[p]ersonal jurisdiction over the Individual Defendants may also exist under and by virtue of the Security Agreement with the U.S. government whereby their alter egos STYGA and HELFORD specifically waived personal jurisdiction."[49]

As a general rule, "an individual's transaction of business within the state solely as a corporate officer does not create personal jurisdiction over that individual though the state has in personam jurisdiction over the corporation[.]" Stuart v. Spademan, 772 F.2d 1185, 1197 (5th Cir. 1985) (identifying this "general rule" as the "fiduciary shield doctrine"). The general rule does not apply when a corporation is the alter ego of the individual officer, i.e., when the corporation is simply a facade for the individual officer's interests and activities. Id. at 1198. In such cases "courts attribute to an individual the corporation's contacts with the forum states." Id.

---

[48] (...continued)
Defendant Nikolaos A. Mamidakis' Amended Motions to Dismiss for Lack of Personal Jurisdiction and Improper Venue, Docket Entry No. 88; Defendant Kyriakos Mamidakis' Amended Motions to Dismiss for Lack of Personal Jurisdiction and Improper Venue, Docket Entry No. 90; Alexandros G. Prokopakis's Amended Motion to Dismiss for Lack of Personal Jurisdiction and Improper Venue, Docket Entry No. 91; Defendant Emmanouil A. Mamidakis' Motions to Dismiss for Lack of Personal Jurisdiction and Improper Venue, Docket Entry No. 92; Defendant Alexandros N. Mamidakis' Amended Motions to Dismiss for Lack of Personal Jurisdiction and Improper Venue, Docket Entry No. 93.

[49] Plaintiff's Opposition to the Mamidakis Defendants' Amended Motions to Dismiss, Docket Entry No. 107, p. 3.

-34-

Plaintiff argues that the Individual Defendants are the alter egos of STYGA and Helford, and that STYGA and Helford's actions may therefore be attributed to the Mamidakis Defendants for purposes of personal jurisdiction. In Stuart the Fifth Circuit cited with approval the Eighth Circuit's decision in Lakota Girl Scout Council, Inc. v. Havey Fund-Raising Management, Inc., 519 F.2d 634 (8th Cir. 1975), where the court

> considered the following factors in determining whether a corporation was the alter ego of its dominant shareholder: "[A] corporation's existence is presumed to be separate, but can be disregarded if (1) the corporation is undercapitalized, (2) without separate books, (3) its finances are not kept separate from individual finances, individual obligations are paid by the corporation, (4) the corporation is used to promote fraud or illegality, (5) corporate formalities are not followed or (6) the corporation is merely a sham. . . In Lakota, the Eighth Circuit held that the jury's finding that the corporation was the individual's alter ego was supported by ample evidence, including evidence that the individual was the sole shareholder and sole incorporator, that he alone made loans to and borrowed from the corporation, that he and his wife owned the building housing the company and received rental payments, and that he used a corporation-purchased automobile for both business of the corporation and incidental personal business.

Stuart, 772 F.2d at 1197 (quoting Lakota, 519 F.2d at 638). The Court observed that in Dudley v. Smith, 504 F.2d 979 (5th Cir. 1974), the Fifth Circuit "found jurisdiction to exist essentially by attributing the defendant's contacts as a corporate representative to him individually." Stuart, 772 F.2d at 1198. The Court noted that

> the alter ego test for attribution of contacts, i.e., personal jurisdiction, is less stringent than that for

liability. . . Accordingly, for jurisdiction to exist, there need not be both the existence of a mere shell corporation and fraud.  Rather, either factor, a shell corporation or fraud is sufficient by itself to justify jurisdiction.

Id. at n.12 (citations omitted).

Since Stuart the Fifth Circuit has identified a number of factors for courts to consider when making an alter ego determination.  See United States v. Jon-T Chemicals, Inc., 768 F.2d 686, 691-92 (5th Cir. 1985), cert. denied, 106 S.Ct. 1194 (1986).  While these factors, sometimes referred to as the "Jon-T factors," were designed for reviewing a parent-subsidiary relationship, they can be modified to determine whether a corporation is the alter ego of an individual.  See Century Hotels v. United States, 952 F.2d 107, 110 & n.5 (5th Cir. 1992). Relevant here, for example, are: (1) whether the Mamidakis Defendants completely control the corporate defendants; (2) the level of financial integration between the Mamidakis Defendants and the corporate defendants; (3) whether the corporate defendants operate with grossly inadequate capital; (4) whether the Mamidakis Defendants use the corporate defendants' property as their own personal property; (5) whether the Mamidakis Defendants use the corporate defendants to pay personal obligations; and (6) whether the Mamidakis Defendants act as if the corporate defendants are extensions of their own personal interests.  See also Bolloré S.A. v. Import Warehouse, Inc., 448 F.3d 317, 325 (5th Cir. 2006) ("Under Texas law, '[a]lter ego applies when there is such unity

-36-

between corporation and individual that the separateness of the corporation has ceased and holding only the corporation liable would result in injustice.' <u>Castleberry v. Branscum</u>, 721 S.W.2d 270, 277 (Tex. 1986).")). The Fifth Circuit has directed lower courts making such determinations to examine the "totality of the circumstances," <u>Century Hotels</u>, 952 F.2d at 110, and to bear in mind that "the alter ego test for attribution of contacts, i.e., personal jurisdiction, is less stringent than that for liability." <u>Stuart</u>, 772 F.2d at 1198 n.12.

Here, plaintiff does not provide specific facts to show that either of the corporate defendants is simply a facade for any individual defendant's interests and activities. Plaintiff offers evidence that Helford has not observed all corporate formalities, but this evidence is not enough to show that Helford was merely a shell corporation. Moreover, plaintiff's contention that Helford is merely a shell corporation is negated by copies of minutes from at least some of Helford's corporate meetings attached as Exhibit 18 to the Deposition of Helford's secretary, Alexander Prokopakis.[49] Plaintiff has made no showing that any of the individual defendants engaged in any conduct that courts typically use to evaluate the existence of an alter ego relationship. For example, plaintiff has made no showing that any individual Mamidakis defendant was the sole shareholder and sole incorporator

---

[49]Exhibit 7 attached to Plaintiff's Opposition to the Mamidakis Defendants' Amended Motions to Dismiss, Docket Entry No. 107.

of STYGA or Helford, that any Mamidakis defendant made loans to and borrowed from STYGA or Helford, that any Mamidakis defendant owned real estate leased to STYGA or Helford and received rental payments from STYGA or Helford, or that any Mamidakis defendant used corporation-purchased resources for both business of the corporation and personal purposes. See Stuart, 772 F.2d at 1197. Absent such evidence, the court concludes that the fiduciary shield doctrine applies, and that neither STYGA nor Helford's contacts with the forum can be imputed to any of the Mamidakis defendants to create personal jurisdiction over them.

## D. Exercise of Personal Jurisdiction Over Corporate Defendants is Fair and Reasonable

Because the individual defendants all lack minimum contacts with Texas, this court need not determine whether the exercise of jurisdiction over them would offend traditional notions of fair play and substantial justice. See Felch v. Transportes Lar-Mex SA DE CV, 92 F.3d 320, 329 n.20 (5th Cir. 1996) ("As Felch failed to establish sufficient 'minimum contacts' with Texas, we need not address whether the exercise of personal jurisdiction in this case would offend traditional notions of fair play and substantial justice."). Since the court has concluded that the two corporate defendants, STYGA and Helford, have sufficient minimum contacts with the forum for the court to exercise personal jurisdiction over them for claims arising from those contacts, the burden shifts to them to show that the exercise of personal jurisdiction over them

would not be fair and reasonable.  See Seiferth, 472 F.3d at 271.

Analysis of this issue is based on five factors:

> (1) the burden on the nonresident defendant; (2) the
> interests of the forum state; (3) the plaintiff's
> interest in obtaining relief; (4) the interstate judicial
> system's interest in the most efficient resolution of
> controversies; and (5) the shared interests of the
> several states in furthering fundamental social policies.

Id. at 276 (quoting Nuovo Pignone, SpA v. STORMAN ASIA M/V, 310

F.3d 374, 382 (5th Cir. 2002)).

### 1.    The Burden on Nonresident Defendants is Small

Corporate defendants contend that they will be burdened in

bringing their witnesses and documents from Liberia and Panama,

respectively, and because many material documents are in the Greek

language.    Defendants' contention that they will be burdened by

having to bring witnesses and documents from Liberia and Panama is

not persuasive because neither of these defendants maintain an actual

presence or conduct business from these seats of their incorporation.

Defendants' contention that they will be burdened by having to

translate documents from Greek to English is similarly unpersuasive

because documents relating to the operation and management of the M/T

GEORGIOS M. are in English, as are the records of the related cases

in this court.    Moreover, the court has already considered both of

these arguments and ruled against the defendants by denying their

motion to dismiss on forum non-conveniens.[50]

_____

[50]See Transcript of Hearing held on December 29, 2011,
Exhibit 7 attached to Plaintiff's Opposition to STYGA and Helford's
(continued...)

-39-

2.    The Interest of the Forum State is Significant

The corporate defendants contend that there is no forum interest in adjudicating this dispute because it is a dispute between foreigners that does not involve residents of the forum and concerns events that likely occurred in international waters.  This contention is not persuasive because plaintiff's claims arise from events that occurred in the Southern District of Texas, and because two of plaintiff's claims arise under federal statutes, the APPS, 33 U.S.C. §§ 1901 et seq., and the Penalty Wage Statute, 46 U.S.C. § 10313.  Accordingly, the court concludes that the forum has a significant interest in adjudicating the plaintiff's claims.

3.    The Plaintiff's Interest in Obtaining Relief is Significant

The corporate defendants contend that plaintiff's interest in obtaining relief is addressed and governed by the plaintiff's contract of employment, which provides for conflicts arising thereunder to be adjudicated in Greece.  As the court has already

---

[50] (...continued)

Amended Motions to Dismiss, Docket Entry No. 106, pp. 4-6 ("Many, if not most, of the relevant documents that deal with the merits are in English, and the Greek documents can be translated into English. It would be more burdensome to translate the many English documents into Greek if the case were transferred to Greece than to [translate] the fewer number of Greek documents into English if the case stays here. . . Although the individual defendants reside in Greece, Helford is a Liberian corporation with no employees in Greece.   The vessel was registered in Malta, and Styga is a Panamanian company.  Although Styga has an office in Greece, much of the conduct at issue in this case occurred in the Southern District of Texas.").

-40-

stated with respect to the defendants' motion to dismiss for forum non conveniens,

> the forum selection clause in plaintiff's employment contract covers disputes between plaintiff and his employer . . . ["]pertaining to the performance of the present contract[."] This clause does not govern the plaintiff's claims in this action, which arose after the contract had been terminated and which deal with federal statutory and Texas law claims, not the parties' performance under the employment contract.[51]

Accordingly, the court concludes that plaintiff's interest in obtaining relief on the claims asserted is significant and that the corporate defendants have failed to show otherwise.

### 4. The Interstate Judicial System's Interest in the Most Efficient Resolution of Controversies Favors Exercise of Jurisdiction Over the Corporate Defendants

The claims alleged in this action are related to cases that were recently before this court involving the same parties, the same events, the same evidentiary materials, the same common nucleus of operative facts, and the same laws. Accordingly, the court concludes that the interstate judicial system's interest in the most efficient resolution of controversies favors exercise of personal jurisdiction over the corporate defendants in this forum.

### 5. The Shared Interests of the Several States in Furthering Fundamental Social Policies Favors Exercise of Jurisdiction Over the Corporate Defendants

The two corporate defendants contend that "[n]o fundamental substantive social policy of the several states or of the

---

[51]Id. at 4.

-41-

United States would be furthered by the retention of this case in the United States."[52]  This contention is not persuasive because plaintiff's claims are based on allegations that defendants deliberately caused their ship to enter this forum in a state that violated the laws of this forum and that, prompted by their subsequent prosecution, the defendants sought to impose liability on the plaintiff for their violations of this forum's laws.  Under these circumstances the court concludes that shared interests of the several states in furthering fundamental social policies represented by the fair enforcement of this forum's laws favors exercise of personal jurisdiction over the corporate defendants.

### 6.   Conclusions as to Existence of Personal Jurisdiction Over the Corporate Defendants

Exercise of personal jurisdiction over STYGA and Helford for all of plaintiff's claims except the claim for intentional misrepresentation is fair and reasonable under the facts of this case because by sailing the M/T GEORGIOS M. into the forum with MARPOL/APPS violations, negotiating a guilty plea in the forum pursuant to which these defendants incriminated the plaintiff, and agreeing to aid in his prosecution even though they knew or would have learned upon conducting an investigation that plaintiff was not responsible for the MARPOL and APPS violations onboard the M/T

---

[52]STYGA and Helford's Amended Motions to Dismiss, Docket Entry No. 89, p. 20.

GEORGIOS M., STYGA and Helford should not be surprised to be haled into court to answer for their conduct.

## E. Conclusions

STYGA and Helford's amended motion to dismiss for lack of personal jurisdiction will be granted as to plaintiff's claim for intentional misrepresentation because plaintiff's allegations reflect that the actions underlying this claim did not occur in this forum, and will be denied as to plaintiff's remaining claims for APPS violations, unseaworthiness, negligence, breach of the duty to defend, maintenance and cure, penalty wages under 46 U.S.C. § 10313, malicious prosecution, breach of fiduciary duty, and gross negligence because plaintiff has alleged facts capable of establishing specific jurisdiction for these claims, and defendants have failed to adduce facts and/or arguments capable of persuading the court that exercising personal jurisdiction over them will violate traditional notions of fair play and substantial justice. The amended motions to dismiss for lack of personal jurisdiction filed by each of the five individual defendants, Nikolaos A. Mamidakis, Kyriakos Mamidakis, Alexandros G. Prokopakis, Emmanouil A. Mamidakis, and Alexandros N. Mamidakis, will be granted because plaintiff has failed to allege facts capable of establishing either general or specific jurisdiction. The Mamidakis Defendants' arguments that plaintiff's claims should be dismissed for improper venue are moot.

-43-

### III. Amended Motions for Partial Summary Judgment

Plaintiffs' Original Verified Complaint asserts a claim for violation of the APPS, 33 U.S.C. § 1910, general maritime claims for unseaworthiness, negligence, intentional misrepresentation, breach of the duty to defend, maintenance and cure, and double wages under 46 U.S.C. § 10313, and pendent state law claims for malicious prosecution, breach of fiduciary duty, and gross negligence. Defendants seek summary judgment on plaintiff's APPS claims under 33 U.S.C. § 1910, plaintiff's claims for maintenance and cure and penalty wages under 46 U.S.C. § 10313, plaintiff's claims for malicious prosecution under Texas law, and plaintiff's claims for breach of the duty to defend.

### A. Standard of Review

Summary judgment is authorized if the movant establishes that there is no genuine dispute about any material fact and the law entitles it to judgment. Fed. R. Civ. P. 56(c). Disputes about material facts are "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 106 S.Ct. 2505, 2511 (1986). The Supreme Court has interpreted the plain language of Rule 56(c) to mandate the entry of summary judgment "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear

-44-

the burden of proof at trial." Celotex Corp. v. Catrett, 106 S.Ct. 2548, 2552 (1986). If the moving party meets this burden, Rule 56(c) requires the nonmovant to go beyond the pleadings and show by affidavits, depositions, answers to interrogatories, admissions on file, or other admissible evidence that specific facts exist over which there is a genuine issue for trial. Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). In reviewing the evidence "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Products, Inc., 120 S.Ct. 2097, 2110 (2000). To obtain summary judgment, defendants were required to establish that there was no genuine dispute about any material fact and that the law entitles them to judgment. Fed. R. Civ. P. 56. Disputes about material facts are "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 106 S.Ct. 2505, 2511 (1986). The Supreme Court has interpreted the plain language of Rule 56 to mandate the entry of summary judgment "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 106 S.Ct. 2548, 2552 (1986).

If the moving party meets this burden, Rule 56(c) requires the nonmovant to go beyond the pleadings and show by affidavits, depositions, answers to interrogatories, admissions on file, or other admissible evidence that specific facts exist over which there is a genuine issue for trial. Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).   In reviewing the evidence "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."   Reeves v. Sanderson Plumbing Products, Inc., 120 S.Ct. 2097, 2110 (2000).

## B.   Act to Prevent Pollution from Ships

Defendants argue that they are entitled to partial summary judgment on plaintiff's APPS claims because (1) plaintiff "does not have standing to bring such a claim as APPS only allows a person 'having an interest which is, or can be, adversely affected . . .' by a violation of the APPS to institute a claim;"[53] (2) "the alleged false statements contained in the Joint Factual Statement in Criminal Action No. 09-572 are not the type of statements subject to the record keeping requirement imposed by APPS, 33 U.S.C. §§ 1903 and 1908, and the applicable regulations thereunder,

---

[53]Defendants' Amended Motion for Partial Summary Judgment on Plaintiff's Claims Under 33 U.S.C. § 1910 a/k/a Act to Prevent Pollution from Ships (Defendants' Motion for Summary Judgment on APPS Claims), Docket Entry No. 94, p. 2.

33 C.F.R. § 151.25;"[55] and (3) "such a claim is prohibited where, as is the case in this matter, the USCG or the EPA has 'commenced enforcement or penalty action with respect to the alleged violation and is conducting such procedures diligently.'"[56]

### 1.   Applicable Law

APPS, 33 U.S.C. § 1901, et seq., represents Congress's implementation of two related marine environmental treaties to which the United States is a party:   the 1973 International Convention for the Prevention of Pollution from Ships and the Protocol of 1978 Relating to the International Convention for the Prevention of Pollution from Ships, generally referred to together as MARPOL 73/78.   These treaties are intended to prevent oil pollution in the sea. APPS is the statute enacted by Congress that prohibits violations of MARPOL, APPS, and the regulations promulgated thereunder by United States flagged vessels and foreign flagged vessels operating or docked within the United States.   See United States v. Jho, 534 F.3d 398, 401 (5th Cir. 2008).   APPS authorizes the United States to impose criminal and civil penalties on polluters and also contains a citizen's suit provision.

APPS authorizes the imposition of criminal penalties for knowing violations:   "A person who knowingly violates the MARPOL

---

[55]Id.

[56]Id.

Protocol, . . . or the regulations issued thereunder commits a class D felony. In the discretion of the Court, an amount equal to not more than ½ of such fine may be paid to the person giving information leading to conviction." 33 U.S.C. § 1908(a). APPS also authorizes the imposition of civil penalties payable to the United States for any violation, whether knowing or not against

> [a] person who is found by the Secretary, or the Administrator as provided for in this chapter, after notice and an opportunity for a hearing, to have –
>
> (1) violated the MARPOL Protocol . . . this chapter, or the regulations issued thereunder shall be liable to the United States for a civil penalty, not to exceed $25,000 for each violation; or
>
> (2) made a false, fictitious, or fraudulent statement or representation in any matter in which a statement or representation is required to be made to the Secretary, or the Administrator as provided for in this chapter, under the MARPOL Protocol . . . this chapter, or the regulations thereunder, shall be liable to the United States for a civil penalty, not to exceed $5,000 for each statement or representation.

33 U.S.C. § 1908(b)(1)-(2). Section 1908(b) also provides that

> Each day of a continuing violation shall constitute a separate violation. The amount of the civil penalty shall be assessed by the Secretary, or the Administrator as provided for in this chapter or his designee, by written notice. In determining the amount of the penalty, the Secretary, or the Administrator as provided for in this chapter, shall take into account the nature, circumstances, extent, and gravity of the prohibited acts committed and, with respect to the violator, the degree of culpability, any history of prior offenses, ability to pay, and other matters as justice may require. An amount equal to not more than ½ of such penalties may be paid by the Secretary, or the Administrator as provided for in this chapter, to the person giving information leading to the assessment of such penalties.

-48-

Id. APPS provides that "[t]he Secretary may compromise, modify, or remit, with our without conditions, any civil penalty which is subject to assessment or which has been assessed."  33 U.S.C. § 1908(c).

In addition to the criminal and civil penalties that APPS authorizes the United States to seek, APPS provides a private right of action pursuant to which

> any person having an interest which is, or can be, adversely affected, may bring an action on his own behalf --
> > (1)    against any person alleged to be in violation of the provisions of this chapter, or regulations issued hereunder. . .

33 U.S.C. § 1910(a)(1).  APPS's private right of action is subject to the following limitations:

> No action may be commenced under subsection (a) of this section --
>
> > (1)    prior to 60 days after the plaintiff has given notice, in writing and under oath, to the alleged violator, the Secretary concerned, or the Administrator, and the Attorney General; or
> >
> > (2)    if the Secretary or the Administrator has commenced enforcement or penalty action with respect to the alleged violation and is conducting such procedures diligently.

33 U.S.C. § 1910(b).

### 2.    Plaintiff Lacks Constitutional and Statutory Standing to Pursue His APPS Claims

Defendants argue that they are entitled to summary judgment on plaintiff's APPS claims because plaintiff does not satisfy the

-49-

requirements of prudential standing. Citing <u>Bennett v. Spear</u>, 117
S.Ct. 1154 (1997), plaintiff responds that the APPS's citizen's
suit provision contains features that evidence Congress's "intent
to eliminate any prudential standing barrier to parties whose
interests are or may be adversely affected."[56]    Consequently,
plaintiff argues that he only needs to satisfy Article III's
requirements for constitutional standing, which he asserts are
satisfied in this case.[57]

Standing questions "whether the litigant is entitled to have
the court decide the merits of the dispute or of particular
issues."    <u>Warth v. Seldin</u>, 95 S.Ct. 2197, 2205 (1975).    The
standing "inquiry involves both constitutional limitations on
federal-court jurisdiction and prudential limitations on its
exercise."[58]    <u>Id.</u>    A plaintiff must first satisfy constitutional
standing requirements stemming from the case or controversy
requirement of Article III of the United States Constitution.    Once

---

[56]Plaintiff's Memorandum of Law in Opposition to Defendants'
Amended Motion for Partial Summary Judgment on Plaintiff's Claim
Under 33 U.S.C. § 1910 a/k/a Act to Prevent Pollution from Ships
("Plaintiff's Opposition to MSJ on APPS Claims"), Docket Entry
No. 108, p. 13.

[57]<u>Id.</u> at 14-16.

[58]In cases alleging CWA violations, Congress has superseded any
prudential limitations by broadly conferring standing to sue on
"any citizen."    33 U.S.C. § 1365(a).    Accordingly, to establish
standing, plaintiffs need only satisfy the requirements of
Article III.    <u>See</u> <u>Save Our Community v. United States Environmental</u>
<u>Protection Agency</u>, 971 F.2d 1155, 1160 n.10 (5th Cir. 1992).

constitutional standing is established a court considers whether there exist any "judicially self-imposed limits on the exercise of federal jurisdiction." Association of Community Organizations for Reform Now ("ACORN") v. Fowler, 178 F.3d 350, 356 (5th Cir. 1999) (quoting Bennett, 117 S.Ct. at 1161). Because the Supreme Court has held that a court may not address the issue of prudential standing before determining that constitutional standing exists, the court must independently assess the issue of constitutional standing. See Steel Co. v. Citizens for a Better Environment, 118 S.Ct. 1003, 1011-16 (1998) (rejecting the practice of assuming constitutional standing and proceeding directly to the merits). See also Ford v. NYLCare Health Plans of Gulf Coast, Inc., 301 F.3d 329, 333 (5th Cir. 2002), cert. denied, 123 S.Ct. 1574 (2003) ("The question of Article III standing must be decided prior to the prudential standing . . . issue[].").

### (a)   Constitutional Standing

Article III of the United States Constitution limits the judicial power of the federal courts to resolution of actual cases and controversies. United States Constitution Art. III, § 2. See Flast v. Cohen, 88 S.Ct. 1942, 1949 (1968).

> In its constitutional dimension, standing imports justiciability: whether the plaintiff has made out a "case or controversy" between himself and the defendant within the meaning of Art. III. This is the threshold question in every federal case, determining the power of the court to entertain the suit.

Warth, 95 S.Ct. at 2205. To establish constitutional standing, the
party invoking federal jurisdiction must establish three elements:

> First, the plaintiff must have suffered an "injury in
> fact" — an invasion of a legally protected interest which
> is (a) concrete and particularized . . . and (b) "actual
> or imminent, not 'conjectural' or 'hypothetical'" . . .
> Second, there must be a causal connection between the
> injury and the conduct complained of — the injury has to
> be "fairly . . . trace[able] to the challenged action of
> the defendant, and not . . .th[e] result [of] the
> independent action of some third party not before the
> court." . . Third, it must be "likely," as opposed to
> merely "speculative," that the injury will be "redressed
> by a favorable decision."

Lujan v. Defenders of Wildlife, 112 S.Ct. 2130, 2136 (1992)
(citations omitted). "To have standing at the summary judgment
stage, [a plaintiff] must present evidence of specific facts that,
if true, would demonstrate an injury in fact that is fairly
traceable to the defendant's conduct and likely to be redressed by
a favorable ruling." Prison Legal News v. Livingston, 683 F.3d
201, 212 (5th Cir. 2012) (citing Lujan, 112 S.Ct. at 2136).

### (1) Defendants' Allegedly Illegal Conduct Injured the Plaintiff

"Article III requires the party who invokes [the] court's
authority to 'show that he personally has suffered some actual or
threatened injury as a result of [the] putatively illegal conduct
of [the] defendant.'" Valley Forge Christian College v. Americans
United for Separation of Church and State, Inc., 102 S.Ct. 752, 758
(1982) (quoting Gladstone, Realtors v. Village of Bellwood, 99
S.Ct. 1601, 1608 (1979)). The injury must be "concrete and

-52-

particularized," "actual or imminent, not 'conjectural' or 'hypothetical,'" and must "affect the plaintiff in a personal and individual way." Lujan, 112 S.Ct. at 2136 & n.1. The Fifth Circuit has stated that "[i]f an individual's statutory or constitutional rights have been violated, and that right is cognizable by the courts, he has suffered an injury." Cramer v. Skinner, 931 F.2d 1020, 1026 (5th Cir.), cert. denied, 112 S.Ct. 298 (1991). In Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc., 120 S.Ct. 693 (2000), the Supreme Court held that "[t]he relevant showing for purposes of Article III standing . . . is not injury to the environment but injury to the plaintiff." Id. at 704. The Court explained that the "injury in fact" requirement in environmental cases is satisfied if an individual adequately shows "that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." Id. at 705. See also Sierra Club v. Morton, 92 S.Ct. 1361, 1366 (1972) ("Aesthetic and environmental well-being, like economic well-being, are important ingredients of the quality of life in our society, and the fact that particular environmental interests are shared by the many rather than the few does not make them less deserving of legal protection through the judicial process.").

Plaintiff asserts that

> [i]t hardly needs argument Plaintiff has suffered injury in fact. He was detained and his movements were restricted within the Southern District of Texas for more

than one (1) year. *See* First Declaration of Mylonakis at
¶¶ 31 [and 38]. He was deprived of his freedom. *Id.* He
was deprived of the society of his family and friends,
and was required to reside in a country which is to him
foreign. *Id.* He was forced to undergo the anxieties and
rigors of criminal proceedings which could have resulted
in his imprisonment for several years. *Id.* His
professional reputation has been ruined. *See* Second
Declaration of Mylonakis at ¶ 17.[60]

The injuries of which plaintiff complains are injuries that
arise from his detention in the United States and his criminal
prosecution for MARPOL/APPS violations existing on the M/T
GEORGIOS M. Although the plaintiff's injuries are not the type of
injuries typically experienced by plaintiffs asserting claims under
environmental statutes, the evidentiary support provided by
plaintiff's declarations satisfy the court that plaintiff has
satisfied the first requirement for constitutional standing, i.e.,

---

[60]Plaintiff's Opposition to MSJ on APPS Claims, Docket Entry
No. 108, p. 15. <u>See also</u> Original Verified Complaint, Docket Entry
No. 1, ¶ 40 (alleging "[t]hough fully and completely exonerated and
acquitted in a jury trial of all charges, Plaintiff nevertheless,
as a result of the Defendants' actions complained of herein,
sustained injury in fact attributable to the Defendants' unlawful
conduct and violations of APPS that includes, but is not limited
to:   his detention and loss of freedom over a period exceeding
fourteen (14) months within the confines of the Southern District
of Texas, first due to his wrongful detention by Defendants; then,
as a purported material witness and subsequently, following his
indictment as an accused awaiting trial; his criminal prosecution
for Defendants' MARPOL violations; loss of his employment as Chief
Engineer of the GEORGIOS M; loss of valuable sea service during the
period of his detention that would have counted toward his
retirement and pension; loss of his medical insurace for him and
his family, for which actual service onboard a vessel as a seafarer
is a sine qua non condition; damage and deterioration to his health
during the period of his detention, damage to his good name and
reputation as a chief engineer; and other losses and damages more
particularly set out in this Complaint.").

-54-

the plaintiff has submitted evidence capable of establishing that he has suffered injuries that are concrete, particularized, and actual, not conjectural or hypothetical, that affect the plaintiff in a personal and individual way.  See Lujan, 112 S.Ct. at 2136.

### (2)  Plaintiff's Injuries Are Not Traceable to the Defendants' Alleged Violations of the APPS

The "case or controversy" limitation of Article III requires that a federal court act only to redress injury that can fairly be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court.  Lujan, 112 S.Ct. at 2136 (citing Simon v. East Kentucky Welfare Rights Organization, 96 S.Ct. 1917, 1926 (1976)). To prove causation the plaintiff must connect his alleged injuries-in-fact to the defendants' alleged illegal conduct.  Simon, 96 S.Ct. at 1927.

Plaintiff has asserted APPS claims against Helford and the individual Mamidakis Defendants, but not against STYGA.[60]  The allegedly illegal actions of Helford and the Mamidakis Defendants that plaintiff contends caused his injuries-in-fact are MARPOL/APPS violations on the M/T GEORGIOS M. before and during the three months that he served as the vessel's Chief Engineer, i.e., from November 29, 2008, to March 1, 2009, and the defendants' allegedly false attribution of those violations to him.  Therefore, to raise a genuine issue of material fact as to causation, plaintiff must

---

[60]Original Verified Complaint, Docket Entry No. 1, p. 14 ¶ 42.

present evidence capable of establishing that but for MARPOL/APPS

violations and/or the false attribution of those violations to him

traceable to Helford and/or the Mamidakis Defendants, he would not

have suffered the injuries about which he complains, i.e.,

(1) being detained within the Southern District of Texas for more

than one year, (2) being deprived of his freedom, (3) being

deprived of the society of his friends and family, (4) being forced

to undergo the anxieties and rigors of criminal proceedings, and

(5) having his professional reputation ruined.

Asserting that his "injuries are directly traceable to the

Defendants' conduct,"[62] plaintiff explains that defendants'

> vessel operated for years with an impermissible
> modification installed that provided a permanent
> unauthorized overboard discharge rendering the vessel's
> IOPP certificate invalid.   The Defendants' guilty
> knowledge is evidenced by the complete absence of a
> mandatory major non-conformity record that they should
> have maintained and should have produced, as they were
> required under the ISM Code.[63]

Plaintiff states that

> STYGA's President[, defendant Kyriakos Mamidakis,]
> testified that he didn't know that it was Plaintiff who
> had installed the permanent "magic pipe," but
> nevertheless signed the board resolution authorizing the
> entry of a Joint Factual Statement that blamed Plaintiff,
> because the lawyers thought that it would be appropriate
> to do so, and he paid the lawyers a lot of money.[64]

---

[62]Plaintiff's Opposition to MSJ on APPS Claims, Docket Entry
No. 108, p. 15.

[63]Id.

[64]Id. at 16 (citing Deposition of Kyriakos Mamidakis, pp. 162-
166).

The evidence that plaintiff cites is sufficient to raise a genuine issue of material fact regarding a causal connection between the injuries about which he complains and the conduct of defendant Kyriakos Mamidakis. Plaintiff's failure to cite any evidence linking the conduct of Helford or any of the other Mamidakis Defendants either to the MARPOL/APPS violations or to the false accusations that he alleges caused his injury-in-fact, lead the court to conclude that plaintiff has failed to satisfy the second requirement for constitutional standing with respect to any defendant other than Kyriakos Mamidakis.

### (3) Plaintiff's Injuries Are Not Likely to Be Redressed by a Favorable Ruling

The redressability "inquiry focuses . . . on whether the *injury* that a plaintiff alleges is likely to be redressed through the litigation." Sprint Communications Co., L.P. v. APCC Services, Inc., 128 S.Ct. 2531, 2542 (2008). See Laidlaw, 120 S.Ct. at 704 (redressability requirement of standing requires a plaintiff to show that "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision"). The specific items of relief sought must serve either to reimburse the plaintiff for losses caused by the defendant's wrongful act, or to eliminate any effects of that act upon the plaintiff. See Steel Co., 118 S.Ct. at 1018.

Plaintiff's APPS claims seek imposition of civil penalties on

Helford and the Mamidakis Defendants for wholly past violations of

MARPOL/APPS:

> 42. Plaintiff, in accordance with the provisions of 33
> U.S.C. § 1910, brings this action . . . to: enforce the
> provisions of APPS against HELFORD and the MAMIDAKIS
> DEFENDANTS; assess civil penalties against them for their
> systematic serial violations of APPS by the said
> Defendants and each of them, for each day that the vessel
> had called at U.S. ports in a state of deliberate non-
> compliance with APPS, and for [] making false fictitious,
> or fraudulent statements or representations by the said
> Defendants and their instrumentality STYGA; assess civil
> penalties commensurate with the egregiousness of the
> violations of APPS by the Defendants, their ability to
> pay, and such "other matters as justice may require,"
> which in the circumstances should include the willingness
> of the said Defendants to scapegoat and falsely accuse
> and blame Plaintiff; in the Court's discretion, award
> Plaintiff a sum not to exceed half (½) of the civil
> penalties to be assessed against the said Defendants.

> 43. For the period of the year 2008, Plaintiff estimates
> that over ten (10) calls were made by the M/T GEORGIOS M
> to U.S. ports of approximately five (5) days duration
> each, and an appropriate civil penalty would be the
> respective amounts set out in 33 U.S.C. 1908(b)(1) and
> (2) — *i.e.* $30,000 daily for a total of fifty (50) days,
> *i.e.* $1,500,000.00 over and above the $1,250,000.99 fine
> STYGA agreed to pay as part of its criminal "deal" in
> this matter.[65]

Plaintiff argues that "[a]ssessing an appropriate civil penalty in

the circumstances would redress Plaintiff's injury by holding

Defendants liable for their misuse of their employees and damages

caused to [him]."[66]

---

[65]Original Verified Complaint, Docket Entry No. 1, pp. 14-15
¶¶ 42-43.

[66]Plaintiff's Opposition to MSJ on APPS Claims, Docket Entry
No. 108, p. 16.

The Supreme Court set the standard for redressability in cases such as this in <u>Steel Co.</u>, 118 S.Ct. at 1003. The citizen-suit plaintiff in that case sought to impose civil penalties on the defendant for past violations of the Emergency Planning and Community Right-to-Know Act ("EPCRA"), 42 U.S.C. §§ 11001, <u>et seq.</u> <u>Steel Co.</u>, 118 S.Ct. at 1008-09. The EPCRA requires users of toxic and hazardous chemicals to file annual chemical inventory forms with local and state authorities. The EPCRA authorizes citizen suits against violators if the EPA fails to pursue an administrative or civil action against the violator after 60 days of receiving notice of the violations and authorizes civil penalties to be paid to the United States Treasury. The citizen-plaintiff discovered that the defendant, a user of toxic chemicals, had not filed the required forms from 1988 through 1995. The plaintiff notified the EPA and the defendant of the violation. Before the 60-day window had lapsed, the defendants filed all the appropriate forms, thereby complying with the statute. The EPA declined to bring an enforcement action, so the plaintiff sued.

Focusing only on the redressability prong of the standing inquiry, the Supreme Court held that civil penalties stemming from a past injury to a citizen-suit plaintiff, but not payable to the United States, do not redress any legitimate Article III injury to a private plaintiff. <u>Id.</u> at 1018-19. The Court reasoned that civil penalties "might be viewed as a sort of compensation or redress to [the plaintiff] if they were payable to [the

plaintiff]," id. at 1018, but that when civil penalties are payable
to the United States, they can only serve an "'undifferentiated
public interest' in faithful execution of EPCRA." Id. The Court
explained that

> although a suitor may derive great comfort and joy from
> the fact that the United States Treasury is not cheated,
> that a wrongdoer gets his just deserts, or that the
> Nation's laws are faithfully enforced, that psychic
> satisfaction is not an acceptable Article III remedy
> because it does not redress a cognizable Article III
> injury.

Id. at 1019 (citing, e.g., Allen v. Wright, 104 S.Ct. 3315, 3326-27
(1984), and Valley Forge Christian College, 102 S.Ct. at 763-65).
Observing that "[r]elief that does not remedy the injury suffered
cannot bootstrap a plaintiff into federal court," id., the Court
held that the citizen-suit plaintiff lacked constitutional standing
to seek civil penalties for violations that have abated by the time
of suit. Id. See Laidlaw, 120 S.Ct. at 707-708 ("Steel Co.
established that citizen suitors lack standing to seek civil
penalties for violations that have abated by the time of suit. . .
In short, Steel Co. held that private plaintiffs, unlike the
Federal Government, may not sue to assess penalties for wholly past
violations. . ."). See also Gwaltney of Smithfield, Ltd. v.
Chesapeake Bay Foundation, Inc., 108 S.Ct. 376, 382 (1987) ("the
harm sought to be addressed by the citizen suit lies in the present
or the future, not in the past"), superseded by statute on other
grounds as stated in Glazer v. American Ecology Environmental
Services Corp., 894 F.Supp. 1029 (E.D. Tex. 1995)).

Like the citizen plaintiff in <u>Steel Co.</u> who sought civil penalties payable to the United States for wholly past violations of the EPCRA, the plaintiff in this action seeks civil penalties payable to the United States for wholly past violations of the APPS. The civil penalties that plaintiff seeks in this action are authorized by 33 U.S.C. § 1908(b), which provides that violators "shall be held liable to the United States for a civil penalty." As the Supreme Court recognized in <u>Steel Co.</u>, by requesting civil penalties payable to the United States plaintiff "seeks not remediation of [his] own injury — reimbursement for the [damages he] incurred as a result of the [MARPOL/APPS violations alleged] — but vindication of the rule of law — the 'undifferentiated public interest' in faithful execution of [the APPS]." <u>Steel Co.</u>, 118 S.Ct. at 1018. Although § 1908(b) provides that "[a]n amount equal to not more than ½ of such penalties may be paid by the Secretary, or the Administrator as provided for in this chapter, to the person giving information leading to the assessment of such penalties," plaintiff has neither alleged nor argued, and the court has found no authority stating, that the APPS — or any other comparable environmental statute — authorizes a court in a citizen suit — as opposed to the Secretary or the Administrator in an administrative proceeding — to award any amount of civil penalties assessed against a violator to a private party.

The Supreme Court revisited the availability of civil penalties in citizen suits in <u>Laidlaw</u>, 120 S.Ct. at 706-08. There,

-61-

the plaintiff sued under the provisions of the Clean Water Act, which like the citizen-suit provisions of the EPCRA and the APPS, required civil penalties to be paid to the United States. The plaintiff alleged that Laidlaw, the operator of a wastewater treatment plant, had failed to comply with mercury discharge limits in its Clean Water permit. Laidlaw, unlike the defendant in Steel Co., continued certain violations after the plaintiff filed suit; however, at some point during the course of litigation, Laidlaw "achieved substantial compliance with the terms of its discharge permit." Id. at 700. Due to Laidlaw's compliance the district court denied the plaintiff's request for injunctive relief. The court, however, did assess a civil penalty, finding that the total deterrent effect of the penalty would be adequate to forestall future violations. Id. at 703. Both parties appealed the ruling on civil penalties, but neither party appealed the ruling on injunctive relief. See id. The court of appeals found that, even assuming the plaintiff had standing at the start of the suit, the case became moot once Laidlaw came into compliance with the Clean Water Act. See id. The court believed "that the elements of Article III standing — injury, causation, and redressability — must persist at every stage of review, or else the action becomes moot." Id. Relying on Steel Co. the appeals court held "that the case had become moot because 'the only remedy currently available to [the plaintiff] — civil penalties payable to the government — would not redress any injury [plaintiff had] suffered.'" Id. (quoting

_Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC),_
_Inc.,_ 149 F.3d 303, 306 (4th Cir. 1998)).

The Supreme Court reversed. On the issue of standing the
Court held that the plaintiff's interest in deterrence was
sufficient to satisfy redressability. The Court explained that

> [t]o the extent that [civil penalties] encourage
> defendants to discontinue current violations and deter
> them from committing future ones, [civil penalties]
> afford redress to citizen plaintiffs who are injured or
> threatened with injury _as a consequence of ongoing_
> _unlawful conduct._

120 S.Ct. at 706-707 (emphasis added). But the Court reiterated
that where the violations at issue are not ongoing but wholly past
the holding in _Steel Co._ that citizen suitors lack standing to seek
civil penalties for violations that have abated by the time of suit
is controlling. _Id._ at 707 (citing _Steel Co.,_ 118 S.Ct. at 118-
19). The Court explained that "[w]e specifically noted in that
case that there was no allegation in the complaint of any
continuing or imminent violation, and that no basis for such an
allegation appeared to exist." _Id._ (citing _Steel Co.,_ 118 S.Ct. at
119, and _Gwaltney,_ 108 S.Ct. 376 ("the harm sought to be addressed
by the citizen suit lies in the present or the future, not the
past")). The Court distinguished _Steel Co._ based on when the
offending conduct stopped; in _Steel Co._ the violations had wholly
abated by the time the plaintiff filed suit. _See id._ at 708.

In the present case the plaintiff neither alleges nor presents
any evidence that the MARPOL/APPS violations for which he seeks the

imposition of civil penalties on Helford and the Mamidakis Defendants were ongoing and were not past violations that had abated by the time he filed suit. As demonstrated by the following excerpts from the Original Verified Complaint, the only MARPOL/APPS violations alleged in the Original Verified Complaint are wholly past violations that occurred prior to the date this suit was filed, i.e., August 24, 2010:

> 28. At all times material hereto, and specifically between November 29, 2008 and March 1, 2009, Plaintiff, having signed ship's articles onboard the Maltese flag Motor Tanker GEORGIOS M, was employed as the vessel's Chief Engineer. . .

> 29. At all times material hereto, Defendants in their respective capacities owned Plaintiff a duty to provide a workplace onboard a lawful ship conforming with all international conventions to which the vessel's flag state — Malta — was a party, including but not limited to the international convention for the prevention of pollution from ships known as MARPOL, and its U.S. codification known as The Act to Prevent Pollution [from] Ships, 33 U.S.C. 1901 et seq. (hereinafter "APPS").

> 30. Unbeknownst to Plaintiff, but known to Defendants, the GEORGIOS M did not meet the requirements of MARPOL or APPS in several respects in that it possessed an International Oil Pollution Prevention Certificate ("IOPP") that incorrectly and untruthfully reflected the arrangements and workings of the oil pollution prevention equipment and appliances onboard, which had been modified and rigged in such a way allowing for same to be bypassed, to directly discharge overboard oily sludge and oily bilge water.

> 31. Unbeknownst to Plaintiff, at all times material hereto, but known to Defendants, the GEORGIOS M had been for a number of years, operating in violation of MARPOL, intentionally discharging overboard engine room oily waste, including sludge and untreated oily bilge water and was using for this purpose certain unlawful permanent installations purposely concealed under the engine room floor plates.

. . .

33.  On February 19, 2009, at the port of Texas City,
Texas, the United States Coast Guard, as a result of
confessions made by some of crewmembers who had actively
participated in carrying on the unlawful discharge of
oily waste overboard, commenced an investigation, which
eventually led into a criminal investigation of STYGA by
the U.S. Department of Justice.

34.  In the course of the pursuit of its investigation
the U.S. Department of Justice entered in plea bargaining
negotiations with STYGA and agreement was reached for
STYGA to: plead guilty and pay a fine[] in the total
amount  of  $1,250,000;  participate  in  a  compulsory
pollution management compliance plan; and, significantly
for  purposes  of  this  action,  cooperate  with  the
government in the criminal prosecution of Plaintiff, who
had not been indicted yet during the plea bargaining
negotiations.

35.  As part of its negotiated guilty plea, STYGA agreed
to  sign  a  joint  factual  statement,  that  would
specifically  blame  Plaintiff,  among  other  shipboard
personnel, for the MARPOL and APPS violations occurring
onboard the GEORGIOS M, with the knowledge and/or consent
of Defendants.  (A copy of the said joint factual state-
ment is hereto attached as EXHIBIT 1).  The signing of
the  said  factual  statement  on  behalf  of  STYGA  was
expressly authorized by each of STYGA's directors, who
are the MAMIDAKIS DEFENDANTS.  (A copy of the relevant
authorization is hereto attached as EXHIBIT 2).

36.  In the course of the investigation of the MARPOL and
APPS violations, and the plea bargaining on behalf of
STYGA, Defendants intentionally violated 33 U.S.C. § 1908
by making false, fictitious, or fraudulent statements
and/or representations to the government regarding the
authorship of and responsibility for the MARPOL and/or
APPS violations onboard.  More particularly, Defendants
falsely represented the violations as actions of the
Plaintiff, when in actual fact the violations had existed
for  some  time  with  the  knowledge  and  approval  of
Defendants.

37.  On information and belief, in negotiating STYGA's
plea  of  guilty,  in  violation  of  33  U.S.C.  §  1908,
Defendants  made  false,  fictitious  or  fraudulent
statements to the government misrepresenting:  the actual

business and economic relationship and arrangements between STYGA (a privately owned company with limited assets); HELFORD (the owner holding legal title to the vessel); the MAMIDAKIS DEFENDANTS; and their privately wholly owned and controlled company JETOIL (as beneficial owners of STYGA, HELFORD, and the GEORGIOS M).

38. By means of their aforementioned false, fictitious or fraudulent statements and/or representations, the MAMIDAKIS DEFENDANTS and HELFORD, succeeded in escaping any and all liability for their repetitive criminal conduct. Instead, STYGA — a company with minimal assets and little to lose — was thereby used as a lightning rod to deflect all responsibility, from the other Defendants, and was required to pay a relatively nominal fine, under an "installment plan." The agreed fine is disproportionately small considering the magnitude of the actual wealth of the MAMIDAKIS DEFENDANTS and HELFORD.

39. By contrast, Plaintiff, who at all times material hereto was innocent, was indicted on August 20, 2009, and on September 1, 2009, was arraigned and entered a plea of "not guilty" on all counts.

40. Though fully and completely exonerated and acquitted in a jury trial of all charges, Plaintiff nevertheless, as a result of the Defendants' actions complained of herein, sustained injury in fact attributable to the Defendants' unlawful conduct and violations of APPS that includes, but is not limited to: his detention and loss of freedom over a period exceeding fourteen (14) months within the confines of the Southern District of Texas, first due to his wrongful detention by Defendants; then, as a purported material witness and subsequently, following his indictment as an accused awaiting trial; his criminal prosecution for Defendants' MARPOL violations; loss of his employment as Chief Engineer of the GEORGIOS M; loss of valuable sea service during the period of his detention that would have counted toward his retirement and pension; loss of his medical insurance for him and his family, for which actual service onboard a vessel as a seafarer is a sine qua non condition; damages and deterioration to his health during the period of his detention, damage to his good name and reputation as a chief engineer; and other losses and damages . . .[66]

---

[66]Original Verified Complaint, Docket Entry No. 1, pp. 9-13 ¶¶ 28-31, 33-40.

The court's conclusion that the plaintiff's APPS claims are based on allegations of past violations is corroborated by the plaintiff's response to the defendants' motion for partial summary judgment on the APPS claims where plaintiff argues that:

> Paragraph 36 of **the Complaint, refers to three (3) distinct failures of the GEORGIOS M to conform to the relevant laws of the United States and MARPOL, on each occasion the Vessel called at ports of the United States while Plaintiff was employed on board as Chief Engineer.** First, as pled in paragraph 30 of the Complaint, the vessel's IOPP (International Oil Pollution Prevention Certificate) was invalid as "significant alterations ha[d] taken place in the construction, equipment, fittings, or arrangements required by the pollution prevention requirements." *See* Complaint, D.E. #1, ¶30; *see also* 33 CFR § 151.19(e)(1). Namely, the installation of a branch line that diverted sludge from following the route to the international shore connection and allowing it, through a "fiddled" check valve, to travel the route of unlawful overboard discharge in contravention of 33 CFR § 155.430(a). Second, the presence onboard and showing to port state control authorities of an Oil Record Book containing false entries for the entire month of June of 2007, and half of May of the same year. Finally, the failure of the Defendants to have onboard the vessel a truthful and accurate record, as dictated by the International Safety Management Code ("ISM Code"), of the major non-conformity of the broken down incinerator for a period exceeding one month, and the installation onboard of unlawful equipment, such as the permanent magic pipe. The false statements referred to in paragraph 36 of the Complaint include the three distinct violations just noted, in addition to the false statements in STYGA's Joint Factual Statement. *See* Complaint, D.E. #1, ¶36.
>
> By reason of these and other MARPOL/APPS violations found onboard the GEORGIOS M, Defendants' failure to own-up to same, and their false statements to the authorities and to Plaintiff, Defendants made Plaintiff a suspect, caused his detention, and procured his indictment and prosecution.[67]

---

[67]Plaintiff's Opposition to MSJ on APPS Claims, Docket Entry No. 108, pp. 5-6 (emphasis added).

Because the only MARPOL/APPS violations that are either alleged in plaintiff's Original Verified Complaint or evidenced in response to the defendants' motion for summary judgment on the APPS claims are past violations that plaintiff alleges occurred either during the three months that he was employed on the M/T GEORGIOS M. from November 2008 to March 2009, or prior to that time, the court concludes that plaintiff has failed to adduce any evidence capable of establishing that the violations for which he seeks to have civil penalties imposed on Helford and the Mamidakis Defendants were ongoing at the time this action was filed. Thus, based on the Supreme Court's holding in Steel Co., 118 S.Ct. at 1018-19, that citizen suitors lack standing to seek civil penalties for violations that have abated by the time of suit, and the Supreme Court's reaffirmation of that holding in Laidlaw, 120 S.Ct. at 707, the court concludes that plaintiff has failed to satisfy the third requirement for constitutional standing, i.e., that a favorable ruling on the plaintiff's APPS claims for civil penalties would redress the plaintiff's injuries-in-fact.

### (4) Conclusions as to Constitutional Standing

For the reasons stated in § III.B.2(a)(2), above, the court concludes that plaintiff has failed to cite any evidence capable of establishing a causal connection between the APPS violations allegedly committed by Helford or any of the Mamidakis Defendants except Kyriakos Mamidakis. For the reasons stated in

-68-

§ III.B.2(a)(3), above, the court concludes that plaintiff's alleged injuries are not likely to be redressed by a favorable ruling on his APPS claims because the only APPS violations for which the plaintiff seeks relief are wholly past violations that are not actionable under the APPS's prospectively worded citizen-suit provision and because the civil penalties that plaintiff seeks for those violations are payable to the United States. Because the plaintiff has failed to cite evidence capable of establishing that a favorable ruling on his APPS claims is likely to redress the injuries-in-fact that he alleges arise from the defendants' APPS violations, the court concludes that plaintiff lacks constitutional standing to assert APPS claims and that the court lacks subject matter jurisdiction to consider those claims.

### (b)  Statutory Standing

Citing Gwaltney, 108 S.Ct. at 376, defendants argue that plaintiff's APPS claims are barred because they rest on wholly past violations that are not actionably under the APPS citizen-suit provision.[68] The citizen-suit provision of the APPS provides that "any person having an interest which is, or can be, adversely affected, may bring an action on his own behalf— (1) against any person alleged to be in violation of the provisions of this

---

[68]Defendants' Reply to Plaintiff's Response to defendants' Amended Motion for Partial Summary Judgment on Plaintiff's Claims Under 33 U.S.C. § 1910 a/k/a Act to prevent Pollution from Ships ("Defendants' Reply"), Docket Entry No. 119, pp. 5-6.

chapter, or regulations issued thereunder." 33 U.S.C. § 1910(a).
Citizen-suit provisions in other environmental statutes containing
the phrase, i.e., "alleged to be in violation," have been construed
to bar claims based on wholly past violations, i.e., violations
that are not ongoing when suit is filed.

In Gwaltney the Virginia State Water Control Board issued a
NPDES permit to Gwaltney of Smithfield, Ltd. in 1974 authorizing
Gwaltney to discharge seven pollutants, including fecal coliform,
chlorine, and total Kjeldahl nitrogen (TKN), from the company's
meat-packing plant on the Pagan River in Smithfield, Virginia. Id.
at 379-80. Between 1981 and 1984 the company repeatedly violated
the conditions of the permit by exceeding effluent limitations on
five of the seven covered pollutants. Id. at 379. In March of
1982 the company installed new equipment to improve its
chlorination system, and the last reported chlorine violation
occurred in October of 1982. Id. The new chlorination system also
helped control the discharge of fecal coliform, the last of which
occurred in February of 1984. Id. In October of 1983 the company
upgraded its wastewater treatment system, and the last reported TKN
violation occurred on May 15, 1984. Id.

The respondents, two environmental groups, sent notice in
February of 1984 to the company, the EPA, and the Virginia Board of
their intent to file a citizen suit under the CWA based on the
company's violations of its permit conditions. Id. at 380. The
respondents filed suit in June of 1984. Id. The company moved to

dismiss for lack of subject matter jurisdiction under the CWA, arguing that the language of 33 U.S.C. § 1365(a), which allows private citizens to bring suit — against any person "alleged to be in violation" of the CWA, required the defendant to be violating the CWA at the time of suit.  Id.  The company contended that the district court lacked jurisdiction over the action because its last recorded violation occurred several weeks before the respondents filed their complaint.  Id.

The Supreme Court agreed, holding that "[t]he most natural reading of 'to be in violation' is a requirement that citizen-plaintiffs allege a state of either continuous or intermittent violation — that is, a reasonable likelihood that a past polluter will continue to pollute in the future." Id. at 381. The Court observed that "the pervasive use of the present tense throughout § [1365]," id. at 382, especially in the definition of "'citizen' as 'a person . . . having an interest which is or may be adversely affected' by the defendant's violations of the Act," id. (quoting § 1365(g)), made plain that "the harm sought to be addressed by the citizen suit lies in the present or future, not in the past." Id.  The Court reasoned in relevant part that

> [a]ny other conclusion would render incomprehensible § [1365's] notice provision, which requires citizens to give 60 days' notice of their intent to sue to the alleged violator as well as to the Administrator and the State.  § 1365(b)(1)(A). If the Administrator or the State commences enforcement action within that 60-day period, the citizen suit is barred, presumably because governmental action has rendered it unnecessary. § 1365(b)(1)(B). It follows logically that the purpose of

notice to the alleged violator is to give it an opportunity to bring itself into complete compliance with the Act and thus likewise render unnecessary a citizen suit.   If we assume, as respondents urge, that citizen suits may target wholly past violations, the requirement of notice to the alleged violator becomes gratuitous.

Id. at 382-83.   The Court further observed that

[a]dopting respondents' interpretation of § [1365's] jurisdictional grant would create a second and even more disturbing anomaly.  The bar on citizen suits when governmental enforcement action is under way suggests that the citizen suit is meant to supplement rather than to supplant governmental action.  The legislative history of the Act reinforces this view of the role of the citizen suit.   The Senate Report noted that "[t]he Committee intends the great volume of enforcement actions [to] be brought by the State," and that citizen suits are proper only "if the Federal, State, and local agencies fail to exercise their enforcement responsibility." S.Rep. No. 92-414, p. 64 (1971), reprinted in 2 A Legislative History of the Water Pollution Control Act Amendments of 1972, p. 1482 (1973) (hereinafter Leg. Hist.).   Permitting citizen suits for wholly past violations of the Act could undermine the supplementary role envisioned for the citizen suit.   This danger is best illustrated by an example.   Suppose that the Administrator identified a violator of the Act and issued a compliance order under § 309(a).  Suppose further that the Administrator agreed not to assess or otherwise seek civil penalties on the condition that the violator take some extreme corrective action, such as to install particularly effective but expensive machinery, that it otherwise would not be obliged to take.   If citizens could file suit, months or years later, in order to seek the civil penalties that the Administrator chose to forgo, then the Administrator's discretion to enforce the Act in the public interest would be curtailed considerably.   The same might be said of the discretion of state enforcement authorities. Respondents' interpretation of the scope of the citizen suit would change the nature of the citizens' role from interstitial to potentially intrusive.   We cannot agree that Congress intended such a result.

Id. at 383.

-72-

Notwithstanding its conclusion that § 1365 does not permit citizen suits for wholly past violations, the Supreme Court remanded for further proceedings because the respondents had also alleged that the company was continuing to violate its NPDES permit when they filed suit. Id. at 385. The Supreme Court concluded that § 1365 confers jurisdiction over citizen suits when the citizen-plaintiffs make a good-faith allegation of continuous or intermittent violation. Id. The Court rejected the company's argument that this construction of § 1365 would permit citizen-plaintiffs to pursue their suits to conclusion even if their allegations of ongoing noncompliance became false at some later point in the litigation because the defendant begins to comply with the Act, reasoning that "[l]ongstanding principles of mootness" would prevent maintenance of suit when there was no reasonable expectation of recurrence. Id. at 386.

Like the citizen-plaintiffs in Gwaltney, plaintiff in this action did not file his federal complaint until after the last recorded violation, and after the defendant polluters had entered the ECP intended to bring the M/T GEORGIOS M. into compliance with MARPOL/APPS. As in Gwaltney, the defendants' remedial efforts were not prompted by the plaintiff's citizen suit; indeed the remedial actions preceded the plaintiff's citizen suit. Moreover, the Supreme Court's concern in Gwaltney that citizen suits for wholly past violations would undermine the supplementary role envisioned by Congress is equally applicable here. By the time plaintiff

filed his federal action STYGA and the United States had entered into and enforced an ECP requiring STYGA to implement a corrective action plan to bring the M/T GEORGIOS M. into compliance with MARPOL/APPS, and the defendants were on track to expend over a $1 million to that end. By the terms of STYGA's Plea Agreement the United States agreed to forgo civil penalties on the condition that the violator — STYGA — take corrective action, i.e., to enter the ECP, that it otherwise would not be obliged to take. Gwaltney, 108 S.Ct. at 383. Thus, the true nature of plaintiff's suit in this case is not "interstitial" but "potentially intrusive" because the United States had *not* failed to exercise its enforcement responsibility. In short, all of the concerns expressed in Gwaltney are present in this case and point to the conclusion that, given the unique facts of this case, plaintiff lacks statutory standing to file suit.

Gwaltney also recognized that standing is conferred by good-faith allegations of continuous or intermittent violations. Id. at 385. However, as explained above, the Original Verified Complaint alleges only past violations that had abated by the date that the plaintiff filed this action on August 24, 2010; and plaintiff's response to defendants' motion for summary judgment cites evidence of only past violations that predate the filing of this action. Therefore, plaintiff has neither alleged nor cited any evidence of a continuing violation. See id. (holding that the plaintiffs' complaint satisfied the jurisdictional requirements of § 1365 and

-74-

conferred standing because their complaint alleged in good faith that "Gwaltney was continuing to violate its NPDES permit when plaintiffs filed suit"). Accordingly, the court concludes that plaintiff lacks statutory standing to assert the APPS claims alleged in his complaint. See Brown v. Offshore Specialty Fabricators, Inc., 663 F.3d 759, 769 (5th Cir. 2011), cert. denied sub nom Cunningham v. Offshore Specialty Fabricators, Inc., 132 S.Ct. 2103 (2012) (recognizing that a prospectively worded citizen-suit provision, like the APPS's, requires that "the harm sought to be addressed . . . lie[] in the present or the future, not in the past," and that the failure to allege and/or provide evidence of violations that are ongoing when suit is filed deprives the plaintiff of statutory standing).

## C. Malicious Prosecution

Defendants argue that they are entitled to summary judgment on plaintiff's malicious prosecution claim because he cannot establish that any "information provided to the Government by the Defendants caused or resulted in the indictment or prosecution of the Plaintiff."[69] Asserting that plaintiff's malicious prosecution

---

[69]Defendants' Amended Motion for Partial Summary Judgment on Plaintiff's Claim of Malicious Prosecution Under Texas Law ("Defendants' Amended Motion for PSJ on Malicious Prosecution Claim"), Docket Entry No. 96, p. 2. See also Defendants' Reply to Plaintiff's Response to Defendants' Amended Motion for Partial Summary Judgment on Plaintiff's Claim of Malicious Prosecution Under Texas Law ("Defendants' Reply to Plaintiff's Opposition to Defendants' Amended Motion for PSJ on Malicious Prosecution (continued...)

-75-

claim is based on the Joint Factual Statement and the Plea Agreement executed by STYGA, and that neither of these documents existed when a grand jury indicted plaintiff on August 20, 2009,[70] defendants argue that plaintiff's prosecution could not have been caused by false statements in those documents.[71] Defendants also assert that

> none of the corporate officers of Defendants nor any of the STYGA Board of Directors provided grand jury testimony to the U.S. Government as part of their indictment of Plaintiff. Specifically, all of the information used to indict Plaintiff came from the testimony of USCG Special Agent Douglas Moore, engine room crew members of M.T. *Georgios M*, documents seized aboard the M.T. *Georgios M*, and the physical evidence of the magic pipe.[72]

Plaintiff argues that defendants' motion for summary judgment on his malicious prosecution claim should be denied because whether a causal connection exists between defendants' actions and his prosecution "is a complex issue of fact."[73]

---

[69](...continued)
Claim"), Docket Entry No. 117, p. 2 (asserting that "there is no issue of material fact that Defendants caused or procured Plaintiff's prosecution").

[70]Defendants' Amended Motion for PSJ on Malicious Prosecution Claim, Docket Entry No. 96, p. 11 (citing Plea Agreement in Criminal Action H-09-572, signed October 6, 2009).

[71]Id.

[72]Id.

[73]Plaintiff's Memorandum of Law in Opposition to Defendants' Amended Motion for Partial Summary Judgment on Plaintiff's Malicious Prosecution Claim Under Texas Law, Docket Entry No. 110, p. 9.

1.   Applicable Law

> The tort of malicious prosecution of criminal proceedings
> occurs when one citizen initiates or procures the
> initiation of criminal proceedings against an innocent
> person, for an improper purpose and without probable
> cause therefor, if the proceedings terminate favorably
> for the person thus prosecuted.

Castellano v. Fragozo, 352 F.3d 939, 945 (5th Cir. 2003) (en banc),

cert. denied, 125 S.Ct. 31 and 33 (2004).  To prevail on his claim

for malicious prosecution under Texas law the plaintiff must

establish that (1) a criminal action was commenced against him;

(2) the prosecution was caused, initiated, or procured by the

defendant or with his aid; (3) the action terminated in the

plaintiff's favor; (4) the plaintiff was innocent; (5) the

defendant acted without probable cause; (6) the defendant acted

with malice; and (7) the criminal proceeding damaged the plaintiff.

Richey v. Brookshire Grocery Co., 952 S.W.2d 515, 517 (Tex. 1997).

Causation is an indispensable element of a malicious

prosecution claim.  Causation is established by proof that a person

initiates or procures a prosecution.   See King v. Graham, 126

S.W.3d 75, 78 (Tex. 2003) (per curiam).   See also Browning-Ferris

Industries v. Lieck, 881 S.W.2d 288, 292 (Tex. 1994).  A defendant

initiates a prosecution when he or she files formal charges against

the plaintiff.   Lieck, 881 S.W.2d at 293.  A defendant procures a

prosecution when its

> actions were enough to cause the prosecution, and but for
> [its] actions the prosecution would not have occurred.
> [The defendant] does not procure a criminal prosecution

-77-

> when the decision whether to prosecute is left to the
> discretion of another, including a law enforcement
> official or the grand jury, unless the person provides
> information which he knows is false.

Lieck, 881 S.W.2d at 293. See also Dangerfield v. Ormsby, 264

S.W.3d 904, 910 (Tex. App. — Fort Worth 2008, no pet.) (explaining

that to establish procurement, the defendant's desire must be the

"determining factor in the official's decision to commence the

prosecution"). Thus, "proof that a complainant has knowingly

furnished false information is *necessary* for liability when the

decision to prosecute is within another's discretion. But such

proof is not *sufficient*." King, 126 S.W.3d at 76. Instead, "there

must be proof that the prosecutor acted based on the false

information and that but for such false information the decision

[to prosecute] would not have been made." Id. Therefore,

> a person who knowingly provides false information to the
> grand jury or a law enforcement official who has the
> discretion to decide whether to prosecute a criminal
> violation cannot be said to have caused the prosecution
> if the information was immaterial to the decision to
> prosecute. If the decision to prosecute would have been
> made with or without the false information, the
> complainant did not cause the prosecution by supplying
> false information.

Id. at 78. See First Valley Bank of Los Fresnos v. Martin, 144

S.W.3d 466, 470 (Tex. 2004).

### 2.  Application of the Law to the Facts

Plaintiff does not assert that defendants initiated his

prosecution by filing a formal complaint. Instead, plaintiff

argues that the defendants procured his prosecution by providing

-78-

false information to the government and by withholding "critical"

information from the government. Plaintiff's argument is based on

his contention that

> (1) the Defendants withheld from the government critical
> information that clearly implicated Defendants in
> MARPOL/APPS irregularities onboard the GEORGIOS M.;
> (2) that Defendants made a "deal" with the government
> just the day before the grand jury received witness
> testimony and returned an indictment against him;
> (3) that the deal between the government and STYGA is
> summarized in the Plea Agreement (**EXHIBIT** 3) and the
> Joint Factual Statement (**EXHIBIT** 4) that unequivocally
> blames Plaintiff for MARPOL violations onboard the
> GEORGIOS M.[74]

Plaintiff asserts that "[t]hese facts are sufficient reason for

allowing Plaintiff's claim to proceed so that he will have an

opportunity to provide full proof for the jury to consider whether

or not there was causation."[75]

   As evidence that the defendants withheld from the government

"critical" information that caused his prosecution plaintiff

asserts that

> Defendants deceived both the Plaintiff and the government
> by keeping from them critical information about the
> problems the GEORGIOS M had had with her incinerator, for
> an extended period of time more than one year before
> Plaintiff joined the GEORGIOS M as her chief engineer.
> STYGA's and the vessel's record of non-conformities,
> mandatory under the International Safety Management Code,
> failed to record these major non-conformities. *See*
> (FIRST EM, p. 84, ll 23 through p. 85, ll 25).
> Defendants kept the truth to themselves. They disclosed
> an avalanche of papers to the government but the critical
> information was missing. The critical information was
> missing because STYGA failed to report the malfunctions

---

[74] Id. at 8.

[75] Id.

-79-

to DNV, the classification society that certified the vessel and its own technical personnel did not enter the information in the vessel's and the company's ISM records. (CHDRV, p. 177, ll 9 through p. 181, ll 16); (CHDRV, p. 129, ll 15 through p. 134, ll 20). The reason the information was missing was probably to cover up a history of unlawful disposal of oily waste overboard in violation of MARPOL when the ship's incinerator was out of order. See (CHDRV, p. 189, ll 6 through p. 192, ll 10; p. 126 ll 3 through p. 127, ll 13).[76]

The deposition testimony of Emmanuel Mamidakis and Christos Dravillas that plaintiff cites in support of his argument that the defendants withheld critical information shows that the incinerator problems at issue occurred in June of 2007, approximately a year and a half before plaintiff joined the M/T GEORGIOS M. as chief engineer in November of 2008. Plaintiff does not argue that information about the incinerator problems in June of 2007 would have exculpated him or weakened the government's case against him, and does not explain how and/or why the defendants' failure to disclose this information could possibly have been a "but-for" cause of the particular charges that he faced in his indictment and criminal prosecution, i.e., that between November 29, 2008, and January 21, 2009, and particularly on January 15, 2009, and February 18, 2009, he had knowingly failed to maintain an Oil Record Book for the M/T GEORGIOS M. in which all disposals of oil residue, overboard discharges, and disposal of oily bilge wastewater were required to be fully recorded.[77]

---

[76]Id. at 3.

[77]See Indictment in H-09-cr-492, Exhibit 5 to Docket Entry No. 1, ¶¶ 11, 15, and 19.

Plaintiff's contention that the relevant decision-makers (i.e., the prosecutors and the grand jury) did not know that the incinerator on the M/T GEORGIOS M. had long-standing problems is belied by excerpts from the grand jury testimony of USCG Special Agent Douglas Moore cited by the plaintiff in his opposition to the defendants' motion for summary judgment. These excerpts show that Moore told the grand jury that when USCG investigators boarded the vessel the incinerator was working but was not heating properly and operated slowly, that responsibility for having the incinerator fixed lay with the chief engineer "if it was brought to his attention;" and that no documentation was found on the vessel showing that the chief engineer ever requested parts to fix the incinerator.[78] Special Agent Moore's testimony is corroborated by and apparently based on USCG Reports of Investigation dated April 16, 2009, and June 15, 2009.[79] Absent evidence from which a reasonable fact-finder could conclude that undisclosed information about the incinerator problems in June of 2007 would have influenced the government's and/or the grand jury's decision to prosecute, a reasonable fact-finder could not conclude that such undisclosed information was material to the decision to prosecute,

---

[78]Grand Jury Testimony of Douglas Moore, Exhibit 2 to Plaintiff's Memorandum of Law in Opposition to Defendants' Amended Motion for Partial Summary Judgment on Plaintiff's Malicious Prosecution Claim Under Texas Law, Docket Entry No. 110, pp. 20-26.

[79]Exhibit D to Defendants' Reply to Plaintiff's Opposition to Defendants' Amended Motion for PSJ on Malicious Prosecution Claim, Docket Entry No. 117.

or that the defendants' failure to disclose such information caused the plaintiff to be prosecuted. See King, 126 S.W.3d at 78.

As evidence that the defendants provided false information to the government, plaintiff asserts that in "the Joint Factual Statement, and specifically in paragraphs 7 and 8 thereof, STYGA accuses among others, the Plaintiff, for actions and practices of which Defendants knew him to be innocent."[80]  Paragraphs 7 and 8 of the Joint Factual Statement state:

> 7.  From at least December 19, 2006, through February 19, 2009, senior engineering officers and other crew members aboard the Georgios M, including three Chief Engineers, acting on behalf of and for the intended benefit of Styga, installed and used a bypass pipe, also referred to as a "magic pipe" or a "magic hose," consisting of a large section of metal pipe, secreted beneath the engine room deck plates of the ship, and connected to a flexible rubber hose of certain length with flanges at either end to bypass pollution prevention equipment on board the Georgios M. In order for sludges to be discharged through the "magic hose," the ship's engineers removed internal components from a check valve in the sludge discharge system which allowed for fluid to flow in both directions, in contradiction of the ship's classification society approved piping system drawings.

> 8.  From at least December 19, 2006, through February 19, 2009, the senior engineers on board the Georgios M, including three Chief Engineers, often directed junior engineering crewmembers to connect the so-called "magic pipe" and deliberately discharged sludges and oily bilge wastes directly into the sea.[81]

---

[80]Plaintiff's Memorandum of Law in Opposition to Defendants' Amended Motion for Partial Summary Judgment on Plaintiff's Malicious Prosecution Claim Under Texas Law, Docket Entry No. 110, p. 5.

[81]Joint Factual Statement, Exhibit 4 to Plaintiff's Memorandum of Law in Opposition to Defendants' Amended Motion for Partial Summary Judgment on Plaintiff's Malicious Prosecution Claim Under Texas Law, Docket Entry No. 110, p. 16.

Plaintiff contends that the statements included in these two paragraphs falsely incriminated him because it is undisputed that the bypass pipe had been installed on the M/T GEORGIOS M. long before he joined the vessel as chief engineer on November 29, 2008.

Even if, as plaintiff contends, the Joint Factual Statement contains false statements made by defendants in an effort to shift blame for MARPOL/APPS violations away from themselves and onto the plaintiff, these false statements do not raise a genuine issue of material fact for trial on plaintiff's malicious prosecution claims because defendants have presented uncontroverted evidence that the Joint Factual Statement was (1) drafted by the government and provided to defendants on September 9, 2009, some twenty (20) days after plaintiff was indicted by a grand jury on August 20, 2009, and (2) executed on "October 6, 2009, a full forty-six (46) days after Plaintiff was indicted."[82]  Therefore, the false statements contained in the Joint Factual Statement could not have caused the plaintiff's prosecution.

Unable to overcome the fact that statements contained in the Joint Factual Statement could not have caused his prosecution because the Joint Factual Statement was written and executed after — not before — he was indicted, plaintiff argues that

> Defendants' disinformation found its way into the grand
> jury proceedings, where a misinformed government official

---

[82]Defendants' Reply to Plaintiff's Opposition to Defendants' Amended Motion for PSJ on Malicious Prosecution Claim, Docket Entry No. 117, p. 7 (citing Exhibit A thereto, Declaration of David G. Hetzel, p. 2 ¶ 6).

> testified about how all of the incinerator problems and
> misdeeds relating to it were attributable to the
> engineers who, as he had been led to believe, had carte-
> blanch from STYGA to incur any repair and any cost in
> order to do the job right, but they failed.      *See*
> **EXHIBIT 2,** at pp. 24-26.[84]

Review of Agent Moore's grand jury testimony shows, however, that

while he attributed responsibility for fixing the incinerator to

the chief engineers, and he expressed his belief that the company

gave the chief engineers carte blanche to repair the incinerator,

his statements on these issues were qualified:

> Grand Juror:   Is that up to the engineers to get all
> those things fixed or is that up to the
> captain or the owners of the ship to get
> those things fixed?
>
> A.    That would be up to the Chief Engineer who was in
> charge of all the engineering equipment to have
> that -- if it was brought to his attention, then he
> would be the one responsible to have it fixed.
> Whether the company would pay for it or not, he
> would make the request through the company.  If it
> needed parts, he would make the request to the
> company to order the parts, have them at the next
> port of call, or if it could be fixed while they
> were underway by the crew members, he would direct
> them to do the corrections of the equipment.
>
> Q.    During your investigation, have you found any
> indication that the company would not pay for or
> provide them with equipment to fix the incinerator
> or use the systems properly?
>
> A.    No.  From every indication the company gave them
> carte blanche to fix whatever was needed or needed
> to be repaired.

---

[84]Plaintiff's Memorandum of Law in Opposition to Defendants'
Amended Motion for Partial Summary Judgment on Plaintiff's
Malicious Prosecution Claim Under Texas Law, Docket Entry No. 110,
p. 4 (citing Grand Jury Testimony of USCG Special Agent Douglas
Moore).

. . .

Grand Juror:   There were never reports showing that the engineers ever requested parts or equipment to fix this?

A.   Not to my knowledge.  I have never seen any.

Grand Juror:   Were there any like indication or paperwork from the Chief Engineer to the owners talking about the problems and --

A.   The problem specifically with the incinerator?

Grand Juror:   Yes.

A.   No, I did not see any.

Grand Juror:   No documentation?

A.   No documentation then.

Mr. Nelson:   Does anybody else have any questions for the Special Agent?

Grand Juror:   I just want to clarify, it charges them falsely putting things in the log. Right?

Mr. Nelson:   Right.

Grand Juror:   They are the ones that wrote that they were doing it in the log?

Mr. Nelson:   Right.

Grand Juror:   And they weren't?

Q.  (By Mr. Nelson)   Again, I could ask you, if the ship discharges sludge over the side, would they be required to record in the Oil Record Book that they discharged oil over the side?

A.   Yes, they would.

Grand Juror:   That was never recorded?

-85-

Q. (By Mr. Nelson)  Were there never any entries in the
                     Oil Record Book indicating that they
                     pumped oil overboard?

A.   No, there was not.[84]

The excerpts from Special Agent Moore's testimony submitted by
the plaintiff show that the grand jury was told that the chief
engineer bore responsibility for having the incinerator fixed only
if the need to do so was brought to his attention; and that the
government did not seek to indict the plaintiff for failing to fix
the incinerator, or for pumping oily waste overboard but, instead,
for failing to maintain the Oil Record Book accurately by failing
to record discharges of oily waste overboard.  Plaintiff does not
cite and the court has not found any evidence that before the
plaintiff's indictment the defendants told the government, or a
government witness told the grand jury, that the plaintiff was
responsible for installing and/or using the bypass — i.e., magic —
pipe that the USCG investigators found onboard the M/T GEORGIOS M.
Moreover, excerpts from the grand jury proceedings included in the
summary judgment record show that this is not a case where the only
information provided to the government and/or the grand jury was
information provided by the defendants.  See King, 126 S.W.3d at 79
(providing that an adverse inference could be drawn if the only
evidence the official had in deciding to prosecute was false).

_____

[84]Grand Jury Testimony of USCG Special Agent Douglas Moore,
Exhibit 2 to Plaintiff's Memorandum of Law in Opposition to
Defendants' Amended Motion for Partial Summary Judgment on
Plaintiff's Malicious Prosecution Claim Under Texas Law, Docket
Entry No. 110, pp. 28-31.

Uncontradicted evidence presented by the defendants shows that the information used to indict the plaintiff came from a variety of sources, e.g., the testimony of USCG Special Agent Douglas Moore, testimony of engine room crewmember Danilo Pagalan, documents seized aboard the M/T GEORGIOS M., and the physical evidence of the bypass — i.e., "magic" — pipe. The USCG Report of Investigation dated June 15, 2009, states that the investigation of the M/T GEORGIOS M. was prompted by

> an allegation made on 18 February 2009 by Danilo PAGALAN, 2nd Engineer (2/E), Motor Tanker (M/T) GEORGIOS M (SUBJECT), IMO number 9011868, indicating the Chief Engineer onboard the M/T GEORGIOS M ordered engineering crewmembers to discharge oily waste (sludge) directly overboard, using the vessel's installed sludge holding tank pump and an undocumented/unauthorized pipe, referred to as a "magic pipe."[85]

Plaintiff does not dispute that the M/T GEORGIOS M. was, in fact, equipped with a bypass — "magic" — pipe that was used to pump oily waste overboard, that the vessel's Oil Record Book was not accurately maintained, that as chief engineer he was responsible for accurately maintaining the Oil Record Book, or that Second Engineer Pagalan implicated him in the MARPOL/APPS violations. This information alone was sufficient to provide the government and the grand jury probable cause to initiate the plaintiff's prosecution for inaccurately maintaining the vessel's Oil Record

---

[85]Report of Investigation dated June 15, 2009, included in Exhibit D to Defendants' Reply to Plaintiff's Response to Defendants' Amended Motion for Partial Summary Judgment on Plaintiff's Claim of Malicious Prosecution Under Texas Law, Docket Entry No. 117.

Book and presenting that inaccurately maintained Oil Record Book to United States authorities.  See Akin v. Dahl, 661 S.W.2d 917, 921 (Tex. 1983) (explaining that in the context of malicious prosecution, probable cause is defined as the existence of such facts and circumstances as would excite belief in a reasonable mind, acting on the facts within the knowledge of the prosecutor, that the person charged was guilty of the crime); First Valley Bank of Los Fresnos v. Martin, 144 S.W.3d 466, 470 (Tex. 2004) (when the objective elements of a crime reasonably appear to have been completed, probable cause is established as a matter of law).

Because plaintiff has failed to cite any evidence from which a reasonable fact-finder could conclude that undisclosed information about incinerator problems in June of 2007 would have influenced the government's and/or the grand jury's decision to prosecute, and because plaintiff has also failed to cite any evidence from which a reasonable fact-finder could conclude that the defendants supplied any false information to the government prior to the date of his indictment, or that the government's or the grand jury's decision to prosecute him would not have been made but for the defendants' non-disclosure of information about the vessel's incinerator, or but-for false information supplied by the defendants, plaintiff has failed to raise genuine issues of material fact for trial on the causation element of his malicious prosecution claims.  See King, 126 S.W.3d at 79 ("[The plaintiffs] argue in essence that causation can be inferred from the falsity of

-88-

[the defendant's] statements. While such an inference might be drawn *in a case in which the only information the official relied on in deciding to prosecute was false,* that is not the situation in this case.") (emphasis added). See also Weaver v. Bell, No. 03-04-00169-CV, 2005 WL 1364046, at *6 (Tex. App. — Austin June 10, 2005, no pet.) (holding that the plaintiff did not procure the defendant's prosecution because, in part, the evidence showed that police investigated and interviewed other witnesses before deciding to arrest the plaintiff).

### 3. Conclusions

The summary judgment record contains uncontroverted evidence that the government was concerned about the plaintiff's activities well before the defendants' asserted cooperation with the government and/or failure to disclose information about past problems with the vessel's incinerator. Because plaintiff has failed to submit any evidence from which a reasonable fact-finder could conclude that the non-disclosures and false statements about which the plaintiff complains would have changed either the government's or the grand jury's decision to prosecute him, plaintiff has failed to present evidence capable of raising a genuine issue of material fact for trial on his malicious prosecution claims. See King, 126 S.W.3d at 78. See also All American Telephone, Inc. v. USLD Communications, Inc., 291 S.W.3d 518, 535-36 (Tex. App. — Fort Worth, 2009). Accordingly,

defendants' motion for summary judgment on defendants' malicious prosecution claims will be granted.

## D.  Breach of the Duty to Defend

Defendants argue that they are entitled to summary judgment on plaintiff's claim for breach of the duty to defend because no duty to defend a crew member charged with a crime in connection with his service aboard a vessel exits under either the general maritime law of the United States or the International Maritime Organizations (IMO). Alternatively, defendants argue that they are entitled to summary judgment because STYGA provided and paid for an effective defense that resulted in plaintiff being found not guilty of all the charges brought against him.[86]

Plaintiff does not dispute that defendants provided him a lawyer and an interpreter. Instead, citing Sheppard v. Taylor, 30 U.S. 675 (1831), and Murray v. Hunt, 552 F.Supp. 234 (S.D. Fl. 1982), plaintiff argues that "the General Maritime Law of the United States . . . imposes a duty on the shipowner-employer not to put his employee-seaman in peril of being imprisoned while in the service of the ship, and makes the shipowner-employer answerable in damages for failing to do so."[87] Plaintiff explains that

---

[86]Defendants' Amended Motion for Partial Summary Judgment on Plaintiff's Claim for Breach of the Duty to Defend, Docket Entry No. 97, p. 2.

[87]Plaintiff's Memorandum of Law in Opposition to Defendants' Amended Motion for Partial Summary Judgment on Defendants' Breach of the Duty to Defend, Docket Entry No. 111, pp. 9-10.

[t]he Defendants abandoned [him], failing to come to his defense by keeping critical exculpatory information from the government and from him.   Had Defendants been truthful and forthcoming, and refused to join in a Joint Factual Statement they knew was false, it is improbable that the government would have been encouraged to carry on Plaintiff's criminal prosecution.  It is in this sense that Defendants breached the duty to come to Plaintiff's defense as they were required under the General Maritime Law.  A vessel owner who knows that the seamen he employs has become entangled in criminal proceedings because of unlawful conditions prevailing onboard his vessel, is required   to   step   forward   and   acknowledge   his responsibility.  If his failure to do so results in their detention, arrest and criminal prosecution, he is liable to them for their abandonment.[88]

Citing Cutrera v. Board of Supervisors of Louisiana State University, 429 F.3d 108, 113 (5th Cir. 2005), defendants reply that "Plaintiff's attempt to transform his Breach of the Duty to Defend claim into a claim of Abandonment is without merit and has not been properly asserted" because it appears for the first time in response to their motion for summary judgment and not in Plaintiff's Original Verified Complaint.[89]

### 1.   Plaintiff Fails to Establish Existence of Duty to Defend

Plaintiff's argument that the defendants violated a duty to defend by abandoning him is based on two opinions:  Sheppard, 30 U.S. at 675, and Murray, 552 F.Supp. at 234.  In Sheppard seamen who were carried against their will on an illicit voyage that

---

[88]Id. at 12-13.

[89]Defendants' Reply to Plaintiff's Response to Defendants' Amended Motion for Partial Summary Judgment on Plaintiff's Claim for Breach of the Duty to Defend, Docket Entry No. 118, p. 2.

caused the seizure and forfeiture of the ship and their own imprisonment in a foreign country sued the shipowners upon their return to the United States. The Supreme Court held that they were entitled to full wages from the time of their shipping to the time of their return to the United States. 30 U.S. at 709-10.

In Murray, 552 F.Supp. at 234, a United States yacht captain was arrested in Greece and charged with possession of drugs (hashish) that unbeknownst to him the yacht's owner kept in the yacht's safe. After three months in jail the captain was tried before a Greek court. The yacht's owner refused to go to Greece to stand trial in the captain's place, but he did execute an affidavit stating that the drugs belonged to him, not to the captain, which the Greek court received in evidence. Upon his return to the United States, the captain sued the owner for damages under the Jones Act, and under theories of unseaworthiness and abandonment. The jury returned a verdict in favor of the plaintiff on all three counts, denied the owner's affirmative defense of contributory negligence, and awarded the plaintiff $200,000 in compensatory damages and $300,000 in punitive damages. In response to the defendant's motion for a new trial, the court upheld the jury's determination that the proximate cause of plaintiff's damage for incarceration was clearly shown to be defendant's leaving the hashish in a safe after clearing Greek customs. Id. at 237. Taking judicial notice of the fact that in many countries of the world possession of hashish is a criminal offense subjecting

-92-

persons charged or convicted to the possibility of incarceration, the court concluded that the owner's bringing the hashish aboard and retaining it in the yacht's safe not only caused plaintiff's injury but also caused the yacht to be unseaworthy.  Id.  Observing that "[t]he general law of abandonment is a very difficult question of interpretation and application," id. at 238, the court found that "plaintiff's abandonment claim comes within the law of abandonment."  Id.  In reaching this decision the court observed that

> masters should be extremely cautious about causing a seaman to be imprisoned in a foreign jail, . . . there is no liability on the vessel or master for the seaman's imprisonment ashore when it rises from the independent acts of the local police or whether it is due from the seaman's disturbance of the peace of the port.

Id. at 238 (quoting 1 M. Norris, the Law of Seamen, § 500 at 590-1 (3d edition 1970)).  The court explained that

> [i]f "independent action of local police" means incarceration by them as a result of their own investigation and not as a result of a suggestion or collusion on the part of the owner, then the scope of liability would be extremely narrow under the independent action of local police exception.
>
> Clearly, the local police action, although initiated by them on the island of Kos in Greece, was not entirely independent of the conduct of defendant yacht-owner in keeping hashish in his cabin safe. But for that conduct, the boarding by the police at Kos would have been routine and innocuous.

Id.  Finally, observing that the jury's award amounted to slightly more than $5,000 for each day of confinement, the court concluded that the award was not excessive and declined to disturb it.  Id.

-93-

Plaintiff argues that his breach of duty to defend claim

satisfies all of the elements for recovery against
Defendants by reason of their failure to come to his
defense, *i.e.* his abandonment. The Defendant became a
subject of investigation for APPS violations onboard the
GEORGIOS M by reason of illicit installations and devices
that had existed onboard the vessel, unbeknownst to
Plaintiff, for years preceding his brief term of service.

. . .

Eventually, Defendants made their deal with the
government that entirely blamed engineers of the GEORGIOS
M for the MARPOL and APPS violations and specifically
blamed the Plaintiff. . . The specifics of the
inculpatory statements made by Defendants against
Plaintiff are contained in the Joint Factual Statement
signed on behalf of STYGA by defendant Alexandros
Prokopakis, with the agreement of the board of directors,
which includes all of the individual defendants. . . Had
the Defendants disclosed the full truth to the Government
and had they not blamed Plaintiff for their vessel's
MARPOL/APPS violations, it is likely that Plaintiff would
not have been detained, would not have been indicted, and
would not have been prosecuted.[90]

As plaintiff recognizes, neither <u>Sheppard</u> nor <u>Murray</u> nor any

of the other authorities that he cites in opposition to defendants'

motion for summary judgment on his breach of duty to defend claim

recognize a duty of a shipowner or a ship operator to defend a

seaman detained to face criminal charges. Instead, these cases

recognize a duty not to abandon a detained seaman unless the

detention was caused by (1) the seaman's disturbance of the peace

of the port, <u>Faraola v. O'Neill</u>, 576 F.2d 1364, 1367 (9th Cir.

1978), or (2) an independent act of local police. <u>Id.</u> <u>See also</u>

---

[90]Plaintiff's Memorandum of Law in Opposition to Defendants'
Amended Motion for Partial Summary Judgment on Defendants' Breach
of the Duty to Defend, Docket Entry No. 111, pp. 17 and 18.

_Murray_, 552 F.Supp. at 238; _Russell v. States Steamship Co._, 376 F.Supp. 233, 237 (D. Ore. 1973) (where seaman was accused of murdering a watchman, the captain had no obligation to obtain his release from imprisonment before permitting the vessel to leave the port).

### 2. Plaintiff's Complaint Does Not Allege Abandonment

The duty not to abandon a detained seaman stems from "the master's obligation implied in the shipping contract, to bring the seaman back with him unless he has been left at the foreign port because of illness, discharge before an American consul, desertion or failure to join." _Faraola_, 576 F.2d at 1367 (citing 1 M. Norris, The Law of Seamen § 500 at 590-1 (3d ed. 1970)). Plaintiff argues that his

> [f]ailure to Defend Count is identical, in terms of the applicable legal principles, with the seamen's claims in _Murray v. Hunt_ and _Sheppard v. Taylor_. In the Complaint Plaintiff expressly pled the unlawful MARPOL violations and practices that had existed onboard the GEORGIOS M without his knowledge, approval, or participation. He has also pled, specifically with reference to the failure to defend count that "[Defendants] kept from Plaintiff information that they had bargained away his liberty by falsely incriminating him and promising to the government to assist in his criminal prosecution while, at the same time they represented to him that they knew he was innocent and that they were trying to persuade the government to release him." See D.E. #1, Verified Complaint, ¶ 78. A more egregious breach of the duty to defend and a crasser act of abandonment of a seaman is difficult to imagine.[91]

---

[91] _Id._ at 14.

Paragraph 78 of the Original Verified Complaint alleges that defendants breached their duty to defend plaintiff by engaging in

> the[] following actions: (a) exercised undue pressure on Plaintiff to accept responsibility for the violations essentially demanding of him to step forward and admit that he was responsible for all of the MARPOL and/or APPS violations; (b) failed to appoint and pay for an interpreter that Plaintiff needed in order to effectively respond in the course of the investigation and in order to effectively make his defense; (c) exercised economic pressure on Plaintiff by reducing and/or stopping the monthly payment that Defendants had been required to pay him under their agreement with the U.S. government for the conditional release of the M/T GEORGIOS M to pressure him into entering a plea of guilty; (d) exercised economic pressure on Plaintiff by stalling and delaying payment of the fees they had promised to pay his local criminal defense attorney, who was appointed by Defendants, in order to force Plaintiff to enter a plea of guilty; (e) prevented him from obtaining access to copies of his own shipboard files and records, dating back to his service onboard the M/T GEORGIOS M, which were necessary for Plaintiff to assist his counsel in preparing his defense, notwithstanding several demands; (f) kept from Plaintiff information that they had bargained away his liberty by falsely incriminating him and promising to the government to assist in his criminal prosecution while, at the same time they represented to him that they knew he was innocent and that they are trying to persuade the government to release him.[92]

Although ¶ 78 of plaintiff's complaint alleges that defendants breached their duty to defend him by engaging in a variety of different actions enumerated in six clauses labeled (a) through (f), in response to defendants' motion for summary judgment plaintiff points to only one of these clauses, i.e., clause (f), as evidence that his complaint alleges that defendants abandoned him. Because clause (f) neither alleges that defendants abandoned

---

[92]Original Verified Complaint, Docket Entry No. 1, ¶ 78.

plaintiff, nor faults defendants for falsely incriminating plaintiff to the United States but, instead, faults defendants for failing to tell him what they had told the United States, the court concludes that ¶ 78 of the Original Verified Complaint does not allege a claim for abandonment. Because plaintiff raised his claim for abandonment for the first time in response to defendants' motion for summary judgment, plaintiff's claim for abandonment is not properly before the court. See Cutrera, 429 F.3d at 113 ("A claim which is not raised in the complaint but, rather, is raised only in response to a motion for summary judgment is not properly before the court.").

### 3. Plaintiff May Not Amend to Assert Claim for Abandonment

Plaintiff has not requested leave to amend to add his claim for breach of the duty to defend. However, even if plaintiff had requested leave to amend, leave would not be granted because the time for filing motions seeking leave to amend expired over a year and a half ago on May 6, 2011.[94] Moreover, despite being aware of defendants' motion for summary judgment on his claim for breach of the duty to defend, plaintiff did not seek leave to amend. In fact, the only request that plaintiff has filed for leave to amend was made on December 5, 2011, in Plaintiff's Response in Opposition to Defendants' Motion to Strike Jury Demand (Docket Entry No. 68). There plaintiff only sought leave "to amend his jurisdictional

---

[94]See Docket Control Order, Docket Entry No. 17.

allegations with reference to Rule 9(h) election in order to preserve and not forfeit his right to a jury trial."[94]  At a hearing held on December 29, 2011, the court denied plaintiff's request for leave to amend "without prejudice to reassert request to allege jurisdictional basis within twenty (20) days following the court's ruling on the pending motion for summary judgment."[95]  Accordingly, even if plaintiff had requested leave to amend to add a claim for abandonment, that request would be denied as untimely.  See Foman v. Davis, 83 S.Ct. 227, 230 (1962) (recognizing failure to cure deficiencies by amendments previously allowed as a plausible reason for a district court to deny a request for leave to amend).

### 4.  Conclusions

Because plaintiff has failed to show the existence of a duty to defend, plaintiff's complaint does not allege abandonment, and plaintiff's time to amend expired long ago, defendants' motion for summary judgment on plaintiff's claims for breach of the duty to defend will be granted.

## E.  Penalty Wages and Maintenance & Cure

Asserting that on March 1, 2009, he was wrongfully discharged as the Chief Engineer of the M/T GEORGIOS M. while the vessel was in the Port of Houston, plaintiff alleges that he was entitled to

---

[94]Plaintiff's Response in Opposition to Defendants' Motion to Strike Jury Demand, Docket Entry No. 68, p. 11.

[95]Hearing Minutes and Order, Docket Entry No. 71.

receive severance pay in an amount equal to forty-five days of his daily wage, and that based on the defendants' failure to pay him severance pay he is entitled to penalty wages under 46 U.S.C. § 10313.[97] Plaintiff alleges that during the time he was "detained ashore in the United States for matters of the M/T GEORGIOS M, . . . he fell ill and developed a 'condition of extreme hypertension affecting his kidney functioning and a severe respiratory illness,'"[98] for which he seeks maintenance and cure.[99]

### 1. Fact Issues Preclude Summary Judgment on Plaintiff's Claim for Penalty Wages

Defendants argue that they are entitled to summary judgment on plaintiff's claims for penalty wages because plaintiff has not perfected *in rem* jurisdiction over the vessel, plaintiff was not discharged while the vessel was in the Port of Houston, and defendants had sufficient cause to withhold any severance pay due.[100]

---

[97]Original Verified Complaint, Docket Entry No. 1, pp. 29-31 ¶¶ 88-94.

[98]Id. at 28 ¶ 82.

[99]Id. at 28-29 ¶¶ 80-87.

[100]Defendants' Amended Motion for Partial Summary Judgment on Plaintiff's Claims for Maintenance & Cure and Penalty Wages Under 46 U.S.C. § 10313 ("Defendants' Amended Motion for PSJ on Claims for Maintenance & Cure and Penalty Wages"), Docket Entry No. 95, p. 8. See also Defendants' Reply to Plaintiff's Response to Defendants' Amended Motion for Partial Summary Judgment on Plaintiff's Claims for Maintenance & Cure and Penalty Wages Under 46 U.S.C. § 10313 ("Defendants' Reply to Plaintiff's Opposition re Defendants' Motion for PSJ on Claims for Maintenance & Cure and Penalty Wages"), Docket Entry No. 116, pp. 4-8. Although in their (continued...)

(a) <u>In Rem</u> Jurisdiction Is Not Necessary for Plaintiff to Seek Penalty Wages

Asserting that "[a]t no time prior to or during this current matter involving Plaintiff's claims against STYGA, Helford and the STYGA Board of Directors has Plaintiff attempted to arrest or arrested the M.T. *Georgios M* or secured a letter of undertaking in his favor in lieu of arresting the M.T. *Georgios M*,"[100] defendants argue that "Plaintiff has no *in rem* jurisdiction over the M.T. *Georgios M*."[101] Plaintiff does not dispute that he has not perfected *in rem* jurisdiction over the vessel but argues, instead, that defendants are not entitled to summary judgment on this basis because defendants have cited no authority holding that *in rem* jurisdiction is essential to his claims for penalty wages.

The statute under which plaintiff seeks penalty wages, 46 U.S.C. § 10313, provides in pertinent part:

(f) At the end of a voyage, the master shall pay each seaman the balance of wages due the seaman within 24 hours after the cargo has been discharged or within 4 days after the seaman is discharged, whichever is earlier. When a seaman is discharged and final payment of wages is delayed for the

---

[99](...continued)
Reply defendants argue that they are entitled to summary judgment because plaintiff has failed to offer legal support for his claim to penalty wages, the court will not consider this argument because it was not raised in defendants' motion and because defendants, not plaintiff, bear the burden of proof on their motion for partial summary judgment.

[100]Defendants' Amended Motion for PSJ on Claims for Maintenance & Cure and Penalty Wages, Docket Entry No. 95, p. 10.

[101]<u>Id.</u>

period permitted by this subsection, the seaman is entitled at the time of discharge to one-third of the wages due the seaman.

(g)(1)    Subject to paragraph (2), when payment is not made as provided under subsection (f) of this section without sufficient cause, **the master or owner shall pay to the seaman 2 days' wages for each day payment is delayed.**

. . .

(i)    This section applies to a seaman on a foreign vessel when in a harbor of the United States. The courts are available to the seaman for the enforcement of this section.

46 U.S.C. § 10313(f), (g)(1), and (i) (emphasis added). Although the plain language of the penalty wage statute imposes liability only on the "master or owner" of the vessel, 46 U.S.C. § 10313(g), courts have held that the penalty wage statute grants "seamen a maritime lien against the vessel for such wages, which attaches at the moment earned wages are *not* timely paid pursuant to the statute." Governor and Co. of Bank of Scotland v. Sabay, 211 F.3d 261, 267 (5th Cir.), cert. denied, 121 S.Ct. 384 (2000). Nevertheless, nothing in the language of the statute suggests that subject matter jurisdiction must be based on in rem jurisdiction over a vessel.

Defendants cite Loberiza v. Calluna Maritime Corp., 781 F.Supp. 1028, 1030 (S.D.N.Y. 1992), in support of their contention that plaintiff must establish in rem jurisdiction to seek penalty wages under 46 U.S.C. § 10313. Although in rem jurisdiction existed in Loberiza, defendants have not cited and the court has

-101-

not found any authority stating that a plaintiff must perfect _in rem_ jurisdiction over the vessel at issue in order to assert a claim for penalty wages under 46 U.S.C. § 10313. Moreover, claims for penalty wages based on _in personam_ jurisdiction are not unusual. _See_ _Caldwell v. Solus Ocean Systems, Inc._, 734 F.2d 1121 (5th Cir.), _cert. denied_, 105 S.Ct. 434 (1984) (seaman brought an _in personam_ action against his employer to recover penalty wages, and the court held that, because the employer was neither the owner nor master of the vessel on which the seaman served, the seaman could _not_ recover penalty wages from the employer); _Sam v. Keystone Shipping Co._, 913 F.Supp. 514 (S.D. Tex. 1996) (summary judgment granted to employer of seaman who filed an _in personam_ action to recover penalty wages from his employer, which managed, for the vessel's owner, the vessel on which the seaman served). Based on these authorities, the court concludes that plaintiff's claim for penalty wages is not subject to summary judgment due to plaintiff's failure to perfect _in rem_ jurisdiction over the vessel.

> (b) Whether Plaintiff Was Discharged Is a Genuine Issue of Material Fact

Defendants argue that no penalty wages are due to plaintiff because plaintiff is unable to establish that he was discharged. Defendants explain that no penalty wages are due to plaintiff because "STYGA continued Plaintiff's employment and salary even after his indictment, through his criminal trial, and STYGA's salary payments from March 1, 2009 until April 30, 2010 totaled

over $200,000.00."[102]    As  evidence  that  plaintiff  was  not

discharged, defendants cite ¶¶ 3-4 of the Security Agreement that

STYGA entered with the United States government pursuant to which

STYGA agreed to continue paying plaintiff and other crew members

their salaries while they were detained in the United States:

> 3.    Owner and Operator agree to continue the employment,
> paying  total  wages  of  those  officers  and  crewmembers
> named in clause 2 above, or who have been served with
> federal  grand  jury  subpoenas  or  material  witness
> warrants,  and  to  keep  such  officers  and  crewmembers
> within the jurisdiction of the Southern District of Texas
> until the Assistant United States Attorney/Department of
> Justice Environmental Crimes Section attorney responsible
> for the pending criminal investigation advises that their
> testimony is no longer needed.
>
> 4.    The Owner and Operator agree to provide reasonable
> lodging, and a meal allowance of Fifty United States
> Dollars  (USD  $50.00)  per  day,  to  those  officers  and
> crewmembers of the Vessel named in clause 2 above while
> in the United States, until the Assistant United States
> Attorney/Department  of  Justice  Environmental  Crimes
> Section attorney responsible for the pending criminal
> investigation advises that their testimony is no longer
> needed. . .[103]

In addition, defendants have attached to their motion copies of

bank records that purport to show that plaintiff was paid over

$200,000.00 during his detention in the United States.[104]

"Plaintiff strongly disagrees with Defendants' contention that

specifically he, along with other disembarked crew members 'were

---

[102] Id. at 16.

[103] Agreement on Security, Exhibit B to Defendants' Amended
Motion for PSJ on Claims for Maintenance & Cure and Penalty Wages,
Docket Entry No. 95, ¶¶ 3-4.

[104] Exhibit E to Defendants' Amended Motion for PSJ on Claims
for Maintenance & Cure and Penalty Wages, Docket Entry No. 95.

still employed by STYGA.'"[105]  Plaintiff asserts, instead, that he "was discharged from his employment and taken off his ship. He did not, in any sense of that word, continue to be 'employed' by STYGA. His employment contract terminated with his discharge from his post as Chief Engineer of the GEORGIOS M."[106]

The evidence before the court establishes that plaintiff entered a contract to serve as Chief Engineer of the M/T GEORGIOS M. for a period of three months,[107] that plaintiff joined the M/T GEORGIOS M. to assume the position of Chief Engineer on November 29, 2008,[108] and that on February 27, 2009, while the vessel was in the Port of Houston, the ship's Master informed plaintiff that he was being discharged and relieved of his duties as Chief Engineer.[109]  Although the evidence also establishes that STYGA and Helford entered a Security Agreement with the United States pursuant to which they agreed to continue paying

---

[105]Plaintiff's Memorandum of Law in Opposition to Defendants' Amended Motion for Partial Summary Judgment on Plaintiff's Claims for Maintenance and Cure and Penalty Wages under 46 U.S.C. § 10313 ("Plaintiff's Opposition to Defendants' MPSJ on Claims for Maintenance & Cure and Penalty Wages"), Docket Entry No. 109, p. 4.

[106]Id. at 4-5.

[107]First Declaration of Plaintiff Ioannis Mylonakis, Docket Entry No. 38, p. 1 ¶ 4. See also Seaman's Contract of Employment, Exhibit A thereto, and Exhibit A to Defendants' Amended Motion for PSJ on Claims for Maintenance & Cure and Penalty Wages, Docket Entry No. 95.

[108]First Declaration of Plaintiff Ioannis Mylonakis, Docket Entry No. 38, p. 2 ¶ 12.

[109]Id. at 4 ¶ 27.

plaintiff's salary as long as the United States continued to detain plaintiff in Texas, plaintiff was not a party to the Security Agreement. Plaintiff's evidence is sufficient to raise a genuine issue of material fact as to whether he was discharged while the vessel was in the Port of Houston and, if so, whether he was entitled to severance pay.

> (c) Whether Defendants Had Sufficient Cause to Withhold Severance Pay Is a Genuine Issue of Material Fact

Citing <u>Thompson v. Offshore Co.</u>, 440 F.Supp. 752, 768 (S.D. Tex. 1977), defendants argue that

> owners of vessels are not liable for penalty wages . . . if "sufficient cause" exists for nonpayment. "Sufficient cause" has been interpreted to include instances where the applicability of [the penalty wage statute] to a given set of facts is unclear and there is no bad faith in withholding of wages.[110]

Defendants contend that "[s]ufficient cause existed to withhold payment of alleged wages . . . given the Plaintiff's continued employment, albeit no longer in the service of the vessel, and his potential complicity in these criminal acts under investigation."[111]

The Fifth Circuit defines "without sufficient cause" as "either conduct which is in some sense arbitrary or willful, or at least a failure not attributable to impossibility of payment."

---

[110]Defendants' Amended Motion for PSJ on Claims for Maintenance & Cure and Penalty Wages, Docket Entry No. 95, pp. 16-17. The penalty wage provision at issue in <u>Thompson</u> was the predecessor seamen wages statute, 46 U.S.C. § 596, now repealed.

[111]<u>Id.</u> at 18.

Fanos v. Maersk Line, Ltd., 363 F.3d 358, 362 (5th Cir. 2004)
(quoting Collie v. Fergusson, 50 S.Ct. 189, 191 (1930)). See also
McCrea v. United States, 55 S.Ct. 291, 294 (1935) (recognizing that
the wrongful withholding of wages is not enough to give rise to
liability; the employer's action also must be "arbitrary, willful,
or unreasonable"). Courts have found sufficient cause in cases
involving a good faith mistake or clerical error, White v. Waterman
Steamship Corp., 365 F.Supp.2d 817, 820 (S.D. Tex. 2005); a
seaman's neglect of his duties, Thomas v. SS Santa Mercedes, 572
F.2d 1331, 1335 (9th Cir. 1978); and honest doubts about the
seaman's claim or demand, Alier v. Sea Land Service, Inc., 465
F.Supp. 1106, 1114 (D.P.R. 1979). Since, however, plaintiff's
complaint is grounded on allegations that defendants concealed from
him the existence of MARPOL and APPS violations on the M/T GEORGIOS
M., whether defendants had sufficient cause to withhold severance
pay from the plaintiff is a genuine issue of material fact for
trial.

(d)  Conclusions as to Penalty Wage Claim

Because defendants have failed to establish that plaintiff
must perfect in rem jurisdiction to seek penalty wages, and because
plaintiff has raised genuine issues of material fact as to whether
he was discharged and whether defendants had sufficient cause to
withhold severance pay, defendants' motion for partial summary
judgment on plaintiff's claims for penalty wages will be denied.

2. Fact Issues Preclude Summary Judgment on Plaintiff's
   Claim for Maintenance & Cure

Defendants argue that they are entitled to summary judgment on

plaintiff's claim for maintenance and cure because the medical

conditions for which plaintiff seeks maintenance and cure are not

related to his service to the vessel and did not manifest

themselves during his service aboard the M/T GEORGIOS M.

Defendants also argue that plaintiff's claims for maintenance and

cure are subject to the choice of law and forum provisions

contained in plaintiff's Greek Seaman's Contract.[113]

Maintenance is the right of a seaman to food and lodging if he

falls ill or becomes injured while in the service of the ship.

Cure is the right to necessary medical services. Both benefits

extend to the point of maximum recovery. As defendants recognize,

the "duty to provide maintenance and cure attaches once the seaman

enters the service of the ship, and it is a duty that no private

agreement may abrogate." Terrebonne v. K-Sea Transportation Corp.,

477 F.3d 271, 279 (5th Cir. 2007).[114] Moreover,

> [t]he right of a seaman to receive maintenance and cure
> for an illness which befalls him *during his service on
> the ship* may continue for a period beyond the duration of
> the voyage, whether he is at home or abroad and even
> though the illness is not caused by the employment. As
> long as the seaman is considered to be "in the service of
> the ship" or vessel, and thus required to return to his
> employer if called to do so, the shipowner has a duty to

---

[113]Id. at 8.

[114]Id. at 19.

provide maintenance and cure in times of illness or injury. . . In fact, the right to maintenance and cure may even attach after the termination of employment so long as the triggering event takes place within a period of time reasonably needed to the accomplishment of tasks in general furtherance of winding up the seaman's employment, such as removing his belongings, quitting the ship, or implementing direct orders given at the time of discharge. . . The meaning of "in the service of the ship" was further refined in *Farrell v. United States*, 336 U.S. 511 (1949), where a seaman was injured while returning to ship after overextending his shore leave. The Court reasoned that a seaman is deemed to be "in the service of the ship" as long as he is "generally answerable to its call of duty."[115]

Defendants argue that plaintiff's claim for cure should be denied because his illness did not arise during or from his service to the vessel, or while he was answerable to the call of duty. In support of this argument defendants assert that "Plaintiff's own admissions and statements from his counsel affirmatively indicate that Plaintiff '. . . developed hypertension for the first time in September 2010 shortly after his indictment,'"[116] i.e., "a full sixteen months after he signed off from the M.T. *Georgios M.*"[117] Defendants explain that

> at the time of Plaintiff's alleged illness or injury, he was not serving any direct or indirect interest of his employer, Defendants, and there were no reciprocal obligations by Plaintiff that rendered him in the service

---

[115]*Id.* (citing <u>Farrell v. United States</u>, 69 S.Ct. 707, 709-10 (1949), <u>Baker v. Ocean System, Inc.</u>, 454 F.2d 379, 385 (5th Cir. 1972), and <u>LeBlanc v. B.G.T. Corp.</u>, 992 F.2d 394, 400 (1st Cir. 1993)).

[116]<u>Id.</u> at 20.

[117]<u>Id.</u>

of the ship.  Additionally, based on the Agreement on
Security, Plaintiff was not answerable to the call of
duty because he was not allowed to leave the Southern
District of Texas.[118]

Defendants conclude that "because Plaintiff's conditions did not

occur or manifest themselves while in service aboard the M.T.

*Georgios M*, Defendants owe no Cure obligation."[119]

Defendants' contention that plaintiff is unable to seek

maintenance and cure for illness that befell him while he was

detained in Texas pursuant to the Security Agreement that STYGA and

Helford entered with the United States has no merit for at least

two reasons.  First, the Supreme Court has stated that the term "in

service of the ship" means that the seaman "must be generally

answerable to its call to duty rather than actually in performance

of routine tasks or specific orders."  <u>Farrell</u>, 69 S.Ct. at 709.

Here it is undisputed that STYGA and Helford agreed to put

plaintiff ashore in the Southern District of Texas and to pay for

his expenses during his detention in Texas in exchange for the

United States' agreement to release the ship.  Accordingly, the

court is not persuaded that merely because plaintiff was not aboard

the ship when the illness for which he seeks maintenance and cure

manifested itself precludes the plaintiff from establishing that

his illness occurred while he was in the service of the ship.

---

[118]<u>Id.</u>

[119]<u>Id.</u> at 21.

Second, the Supreme Court has expressed a policy of making the maintenance and cure remedy as simple as possible:

> It has been the merit of the seaman's right to maintenance and cure that it is so inclusive as to be relatively simple, and can be understood and administered without technical considerations. It has few exceptions or conditions to stir contentions, cause delays, and invite litigations. The seaman could forfeit the right only by conduct, whose wrongful quality even simple men of the calling would recognize-insubordination, disobedience to others, and gross misconduct. On the other hand, the Master knew he must maintain and care for even the erring and careless seaman, much as a parent would a child. For any purpose to introduce a graduation of rights and duties based on some relative proximity of the activity at time of injury to the "employment" or the "service of the ship," would alter the basis and be out of harmony with the spirit and function of the doctrine and would open the door to the litigiousness which has made the landman's remedy so often a promise to the ear to be broken to the hope.

Farrell, 69 S.Ct. at 709-10. It is disingenuous for defendants to argue that plaintiff is not entitled to penalty wages because he remained employed while detained in Texas, but that the plaintiff is not entitled to maintenance and cure because he was not in service of the ship while so detained. In Farrell the Supreme Court made clear that the illness or injury for which a seaman is entitled to receive maintenance and cure need not result from or be in any way causally related to his shipboard duties. Id. As long as a seaman's illness occurs in the course of his employment, a seaman may recover even for an injury sustained on land. See Aguilar v. Standard Oil Co. of New Jersey, 63 S.Ct. 930, 936 (1943) (reasoning that the policy considerations supporting the broad obligation of maintenance and cure require an equally broad

-110-

definition of "service" as used in the phrase "in the service of the ship" and extending that term to include injuries sustained while on shore leave).

### 3. Forum Selection Clause in Plaintiff's Employment Contract Does Not Require Dismissal of Plaintiff's Claims for Penalty Wages or Maintenance & Cure

Citing paragraph 17 of plaintiff's employment contract, defendants argue that they are entitled to summary judgment on plaintiff's claims for penalty wages and maintenance and cure.[119] Defendants explain that

> Plaintiff's Contract of Employment provides "that any dispute between the seaman and the employer company pertaining to the performance of the present contract shall be governed by the Greek Laws and the contracting parties hereby agree for the courts in Piraeus to be exclusively competent for the resolution of any such dispute.[120]

As plaintiff points out, "[t]he court has already ruled on Defendants' contractual forum selection clause arguments and has denied them."[121]  The court is not persuaded that this clause of the plaintiff's employment contract entitles defendants to summary judgment on plaintiff's claims for penalty wages and/or maintenance

---

[119]Id. at 22.

[120]Id. (quoting Seaman's Contract of Employment, Exhibit A to Defendants' Amended Motion for PSJ on Claims for Maintenance & Cure and Penalty Wages, Docket Entry No. 95, ¶ 17).

[121]Plaintiff's Opposition to Defendants' MPSJ on Claims for Maintenance and Cure and Penalty Wages, Docket Entry No. 109, p. 14 (citing Exhibit 4 thereto, Transcript of December 29, 2011 Status Conference, pp. 4 and 30-31).

and cure because those claims are not based on that employment contract. Plaintiff's claim for penalty wages is based on a federal law that expressly extends to foreign seamen, 46 U.S.C. § 10313. Moreover, even if plaintiff's claim for maintenance and cure is based on his employment contract, defendants have failed to establish that the plaintiff would not be entitled to maintenance and cure pursuant to the Security Agreement that STYGA and Helford entered with the United States that obligated them to provide benefits to the disembarked seafarers, including the plaintiff.

### 4. Conclusions

For the reasons explained above, the court concludes that defendants' motion for partial summary judgment on the plaintiff's claims for penalty wages and maintenance and cure should be denied because defendants have failed to establish that those claims are subject to the forum selection clause in plaintiff's employment contract and because genuine issues of material fact exist as to each of these claims. Accordingly, defendants' motion for summary judgment on plaintiff's claims for penalty wages and for maintenance and cure will denied.

### IV. **Plaintiff's Emergency Motion for Sanctions**

Plaintiff seeks an order issued pursuant to the court's inherent power sanctioning the two corporate defendants, STYGA and Helford, and two of the individual defendants, Kyriakos Mamidakis, and Emmanuel Mamidakis, for giving perjured testimony in

-112-

depositions taken on July 19 and July 20, 2011.[122]  As sanctions for
the perjured deposition testimony, plaintiff asks the court (1) to
deny the motions to dismiss for lack of personal jurisdiction filed
by each of these four defendants, and (2) to assess against these
four defendants costs and attorney's fees that plaintiff has
incurred taking their perjured depositions and expending time,
effort, and money pursuing discovery that should have been provided
when they were first deposed.[123]  Asserting that the testimony at
issue is not perjured, these four defendants oppose plaintiff's
motion for sanctions.[124]

## A.   **Standard of Review**

When parties engage in bad faith conduct, courts usually rely
on the Federal Rules of Civil Procedure for sanctions, e.g.,
Rules 16(f), 37(b)(2)(A) and 41(b), which allow courts to impose
sanctions for a party's failure to comply with obligations imposed
by the Federal Rules and the court's scheduling and discovery
orders.   See Natural Gas Pipeline Company of America v. Energy
Gathering, Inc., 2 F.3d 1397, 1410 (5th Cir. 1993), cert. denied,
114 S.Ct. 882 (1994) (citing Chambers v. NASCO, Inc., 111 S.Ct.
2123, 2136 (1991)).   Sanctions possible under the Federal Rules

---

[122]Emergency Motion to Sanction Certain Defendants for Perjured
Deposition Testimony, Docket Entry No. 79, p. 1.

[123]Id. at 8-9.

[124]Defendants' Response to Plaintiff's Motion for Sanctions,
Docket Entry No. 102, p. 2.

Rules possible under the Federal Rules

range from dismissal to awarding judgment against the errant party, directing that designated facts or matters be taken as established, prohibiting introduction of designated evidence, striking pleadings, staying further proceedings, treating the failure to obey as a contempt, and/or an award of the reasonable attorney's fees and costs caused by plaintiff's noncompliance. Fed.R.Civ.P. 16(f)(1)(B), 16(f)(1)(C), 16(f)(2); Fed.R.Civ.P. 37(b)(2)(A), 37(b)(2)(C); Fed.R.Civ.P. 41(b). In Chambers, 111 S.Ct. at 2123, the Supreme Court held that when sanctions under applicable rules and statutes are inadequate, a court may call upon its inherent powers to assess attorney's fees against a party who has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." 111 S.Ct. at 2133 (quoting Alyeska Pipeline Service Co. v. Wilderness Society, 95 S.Ct. 1612, 1622-23 (1975)). In Chambers the Supreme Court upheld the imposition of sanctions in the form of attorney's fees and associated costs pursuant to the court's inherent powers against a litigant who had repeatedly engaged in bad-faith conduct. The Court stated that

> if a court finds "that fraud has been practiced upon it, or that the very temple of justice has been defiled," it may assess attorney's fees against the responsible party . . . as it may when a party "shows bad faith by delaying or disrupting the litigation or by hampering enforcement of a court order."

Id. (citations omitted). The Court explained that this inherent power

> is necessary to the integrity of the courts, for tampering with the administration of justice in [this]

-114-

> manner . . . involves far more than an injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public. . . .
>
> Because of their very potency, inherent powers must be exercised with restraint and discretion. A primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process. . . [O]utright dismissal of a lawsuit . . . is a particularly severe sanction, yet is within the court's discretion. Consequently, the less severe sanction of an assessment of attorney's fees is undoubtedly within a court's inherent power as well.

Id. at 2136 (quotations and citations omitted). The Court cautioned lower courts that "[t]he inherent power is not a broad reservoir of power, ready at an imperial hand, but a limited source; an implied power squeezed from the need to make the court function." Id. The Fifth Circuit has reiterated this caution and also stated that "the threshold for the use of inherent power sanctions is high." Crowe v. Smith, 151 F.3d 217, 226 (5th Cir. 1998), cert. denied, 119 S.Ct. 2047 (1999).

**B. Analysis**

Plaintiff's motion for sanctions is based on his discovery that during depositions taken in July of 2011, Kyriakos Mamidakis and Emmanuel Mamidakis testified falsely about the relationship of STYGA and the M/T GEORGIOS M. with engineer Christos Dravillas. At his July 19, 2011, deposition Kyriakos Mamidakis testified as follows:

Pg. 136

19. Q. Mr. Darvilas comes to the office from time to
20. time?

-115-

21.  A.  [In English] Just in case . . . the captains

22.      want to ask him, or the new engineer has to
         ask him certain

23.      informations, because he was on the vessels
         for many years

24.      so know a lot of details.

25.  Q.  Does Mr. Darvilas get paid for what he does?

Pg. 137

1.  A.  [In English] No. To the best of my knowledge.

2.  Q.  <u>He works for free?</u>

3.  A.  [In English] No, he doesn't works.

         . . .

19.  Q.  Mr. Darvilas, does he work for any of the
         other

20.      companies --

21.  A.  [In English] <u>No.</u>

22.  Q.  -- within the group?

23.  A.  [In English] No.[125]

At his July 20, 2011, deposition Emmanuel Mamidakis testified
as follows:

Pg. 56

17  Q.  Where is Mr. Darvilas employed now?

18.  A.  No. Darvilas retired since December 29 --
         2009.

_____

[125]Emergency Motion to Sanction Certain Defendants for Perjured
Deposition Testimony, Docket Entry No. 79, p. 5 (quoting Exhibit 4
thereto, excerpt from Deposition of Kyriakos Mamidakis at pp. 136-
37).

19. Q.   Under what circumstances did the employment of

20.      Mr. Darvilas with Styga end?

21. A.   He applied for pension.

22. Q.   Was there a falling out between him and Styga?

23. A.   What do you mean "falling out"?

24. Q.   A--

25.      MR. KARAMITSIOS: [Speaking in Greek.]

Pg. 57

1.  THE WITNESS: No. No, no.  He decided --

2.  BY MR. GAITAS:

3.  Q.   He decided to retire?

4.  A.   -- to retire because he had completed his

5.  years needed for pension and he applied for his
    pension.

6.  Q.   Do you know if he's working anywhere else now?

7.  A.   No.  As far as I know, no.[126]

Plaintiff contends that the deposition testimony of Kyriakos
Mamidakis and Emmanuel Mamidakis quoted above is false because on
March 2, 2012, plaintiff's counsel received from defendants'
counsel a CD containing e-mails exchanged between the M/T
GEORGIOS M., STYGA, and third parties showing that in July of 2011
when the above-quoted depositions were taken, Dravillas was onboard

---

[126]Id. at 4 (quoting Exhibit 3 thereto, excerpt from Deposition
of Emmanuel Mamidakis at pp. 56-57).

the M/T GEORGIOS M. as STYGA's port engineer while the vessel was trading between Cuba and Venezuela.[128] Plaintiff asserts that

> the GEORGIOS M e-mails recently produced, even though quite "sanitized" and missing entire months of correspondence, (*e.g.* the e-mails for the months of January and February 2010 are entirely missing), nevertheless bear out the fact that Dravillas, notwithstanding the denials in the deposition testimony of Defendants Kyriakos and Emmanuel Mamidakis, was employed by STYGA as a superintendent engineer of the GEORGIOS M through 2010 and 2011. . .[129]

Plaintiff asserts that

> [f]ollowing the July 2011 depositions in Greece, [p]laintiff repeatedly sought from Defendant STYGA to produce Mr. Dravillas for a discovery deposition in Greece during the week of March 12, 2012[, . . . but that t]he answer of the [d]efendants, relayed through their counsel, has been a repetition of their client's position, *e.g.* "As to Mr. Dravillas, he does not wish to testify and as you are aware he retired from Styga in 2009."[130]

Citing <u>Brown v. Oil States Skagit Smatco</u>, 664 F.3d 71, 77-78 (5th Cir. 2011), plaintiff asks the court to sanction the four defendants, Kyriakos Mamidakis, Emmanuel Mamidakis, STYGA, and

---

[128]<u>Id.</u> at 2-3 (quoting e-mail from STYGA to Blassis Maritime sent on July 27, 2011, stating "Per our Superintendent (Mr. Dravillas presently on board . . .," Exhibit 1 thereto; and e-mail from STYGA to the Master of the M/T GEORGIOS M., sent on July 12, 2011 asking Dravillas to call Mr. E. Mamidakis at the office, Exhibit 2 thereto).

[129]<u>Id.</u>

[130]<u>Id.</u> at 5 (citing Exhibit 5 thereto, exchange of correspondence between counsel).

-118-

Helford, "for polluting truth and failing 'to keep the streams of justice clear and pure.'"[130] Plaintiff asks the court

> to deny the motions of Defendants Kyriakos Mamidakis, Emmanuel Mamidakis, Styga Compania Naviera S.A., and Helford Marine Inc. whereby they have asserted defenses of lack of personal jurisdiction. This is a far milder sanction than entirely striking the four (4) Defendants' pleadings that might otherwise be appropriate in this case.
>
> Moreover, Plaintiff respectfully requests the Court to assess against the four (4) Defendants the reasonable fees and costs Plaintiff has incurred in taking their perjured depositions, and expending a substantial amount of time, effort and money in pursuing the discovery that the said four (4) Defendants should have yielded months ago, when they were first deposed. . .
>
> Finally, Plaintiff prays that the Court admonish the said Defendants to abide by their obligations as litigants, and be truthful and reasonable about making their employees available for depositions including Mr. Christos Dravillas, who should be made available for his deposition in the Southern District of Texas, at the said Defendants' cost and expense, after Plaintiff has completed the depositions he has noticed to be taken [in] Greece and can arrange for the taking of same.[131]

In Brown, 664 F.3d at 77-78, the Fifth Circuit held that the district court did not abuse its discretion by dismissing the plaintiff's case with prejudice as a sanction for giving perjured testimony during a deposition.

Plaintiff has not cited — and the court has not found — any authority for denying a defendant's motion to dismiss for lack of

---

[130] Id. at 7-8 (quoting Lord Denning in his book "The Due Process of Law," quoting Lord Hardwicke in The St. James' Evening Post case (1742) 2 Atkins 469 at p. 472.

[131] Id. at 8-9.

personal jurisdiction as a sanction for perjury committed during a deposition. Because the court has already concluded that STYGA and Helford's motion to dismiss for lack of personal jurisdiction should be denied with respect to all but one of plaintiff's claims, plaintiff's request for this relief with respect to those defendants is largely moot. As to plaintiff's claim for intentional misrepresentation against STYGA and Helford, and all of plaintiff's claims against Kyriakos Mamidakis and Emmanuel Mamidakis, the court will deny the plaintiff's request for sanctions in the form of a denial of their motions to dismiss for lack of personal jurisdiction because the court is not persuaded that the court's "inherent power" authorizes the exercise of personal jurisdiction where it does not otherwise exist.

Defendants contend that the deposition testimony at issue is not false because Dravillas formally retired and took a Greek pension at the end of 2009 and since then, has only been sent on assignment for STYGA as an independent consultant once in 2010, four times in 2011, and twice in 2012.[132] Defendants also argue that the deposition testimony of Kyriakos Mamidakis is not false because he did not know that following retirement Dravillas continued to perform assignments for STYGA.[133]

---

[132]Defendants' Response to Plaintiff's Motion for Sanctions, Docket Entry No. 102, p. 3 (citing Exhibit B, Second Deposition of Emmanuel Mamidakis (March 2012), pp. 70-71).

[133]Id.

The e-mails showing that Dravillas, despite having retired in 2009, was onboard the M/T GEORGIOS M. in July of 2011 serving as superintendent engineer when Kyriakos Mamidakis and Emmanuel Mamidakis testified at their depositions that he no longer worked for STYGA, constitute prima facie evidence of false testimony intended to delay and hinder the plaintiff's prosecution of this case. Although for the reasons stated above the court is not persuaded that the sanctions plaintiff seeks are appropriate under the circumstances of this case, the court will submit a spoilation of evidence instruction at trial so that the jury can consider the false deposition testimony of Kyriakos Mamidakis and Emmanuel Mamidakis as the representatives of corporate defendants STYGA and Helford in evaluating the credibility of these two corporate defendants and the amount of damages for which they are responsible. Accordingly, the plaintiff's motion for sanctions will be granted in part and denied in part.

## V.  **Defendants' Objections to Plaintiff's Evidence**

Defendants object to the Plaintiff's First, Second, and Third Declaration, the declaration of plaintiff's wife, Evangelina Louloudaki, and to the European Court of Human Rights Summary.[135] Because the court has not considered any of the evidence to which

---

[135]Defendants' Objections to Evidence Offered by Plaintiff, Docket Entry No. 115.

the defendants expressly object to reach the decisions embodied in
the Memorandum Opinion and Order, defendants' objections contained
in Docket Entry No. 115 are moot.[136]

## VI. Conclusions and Order

For the reasons explained in § IV, above, plaintiff's
Emergency Motion to Sanction Certain Defendants for Perjured
Deposition Testimony (Docket Entry No. 79) is **DENIED** as to the
individual defendants, Kyriakos Mamidakis and Emmanuel Mamidakis,
and **DENIED IN PART** and **GRANTED IN PART** as to the corporate
defendants, STYGA and Helford.

For the reasons stated in § II, above, the court concludes
that plaintiff has carried his burden of establishing facts capable
of supporting the court's exercise of personal jurisdiction over
the corporate defendants, STYGA and Helford, on all of plaintiff's
claims except his claim for intentional misrepresentation, and that
STYGA and Helford have failed to carry their burden of establishing
facts capable of establishing that the court's exercise of personal
jurisdiction over them would violate traditional notions of fair
play and substantial justice, but that plaintiff has failed to
carry his burden of establishing facts capable of supporting the

---

[136]The court has relied on ¶¶ 4, 12, 27, 31, and 38 of
Plaintiff's First Declaration and ¶ 17 of Plaintiff's Second
Declaration.  Defendants have not objected to these paragraphs.

court's exercise of personal jurisdiction over the individually named defendants. Accordingly, Defendant Nikolaos A. Mamidakis' Amended Motions to Dismiss for Lack of Personal Jurisdiction and Improper Venue (Docket Entry No. 88) is **GRANTED** for lack of personal jurisdiction and **MOOT** as to improper venue; STYGA Compania Naviera S.A. and Helford Marine Inc.'s Amended Motions to Dismiss for Lack of Personal Jurisdiction and Improper Venue (Docket Entry No. 89) is **GRANTED** as to plaintiff's claim for intentional misrepresentation and **DENIED** as to plaintiff's claims for violation of the APPS, 33 U.S.C. §§ 1910, et seq., unseaworthiness, negligence, breach of the duty to defend, maintenance and cure, penalty wages under 46 U.S.C. § 10313, malicious prosecution, breach of fiduciary duty, and gross negligence; Defendant Kyriakos Mamidakis' Amended Motions to Dismiss for Lack of Personal Jurisdiction and Improper Venue (Docket Entry No. 90) is **GRANTED** for lack of personal jurisdiction and **MOOT** as to improper venue; Alexandros G. Prokopakis's Amended Motion to Dismiss for Lack of Personal Jurisdiction and Improper Venue (Docket Entry No. 91) is **GRANTED** for lack of personal jurisdiction and **MOOT** as to improper venue; Defendant Emmanouil A. Mamidakis' Motions to Dismiss for Lack of Personal Jurisdiction and Improper Venue (Docket Entry No. 92) is **GRANTED in PART and MOOT in PART**; and Defendant Alexandros N. Mamidakis' Amended Motions to Dismiss for Lack of

Personal Jurisdiction and Improper Venue (Docket Entry No. 93) is **GRANTED** for lack of personal jurisdiction and **MOOT** as to improper venue.

For the reasons explained in § III.B, above, Defendants' Amended Motion for Partial Summary Judgment on Plaintiff's Claims Under 33 U.S.C. § 1910 a/k/a Act to Prevent Pollution from Ships (Docket Entry No. 94) is **GRANTED**.

For the reasons explained in § III.E, above, Defendants' Amended Motion for Partial Summary Judgment on Plaintiff's Claims for Maintenance & Cure and Penalty Wages Under 46 U.S.C. § 10313 (Docket Entry No. 95) is **DENIED**.

For the reasons explained in § III.C, above, Defendants' Amended Motion for Partial Summary Judgment on Plaintiff's Claim of Malicious Prosecution Under Texas Law (Docket Entry No. 96) is **GRANTED**.

For the reasons explained in § III.D, above, Defendants' Amended Motion for Partial Summary Judgment on Plaintiff's Claim for Breach of the Duty to Defend (Docket Entry No. 97) is **GRANTED**.

For the reasons explained in § V, above, Defendants' Objections to Evidence Offered by Plaintiff (Docket Entry No. 115) are **MOOT**.

-124-

The court will conduct a scheduling conference on Friday, December 14, 2012, at 2:30 p.m. in Courtroom 9B, 9th Floor, United States Courthouse, 515 Rusk Avenue, Houston, Texas 77002 .[137]

**SIGNED** at Houston, Texas, this the 3rd day of December, 2012.

_____
SIM LAKE
UNITED STATES DISTRICT JUDGE

---

[137]The court has allowed the parties extraordinary leeway in submitting lengthy briefs and other written materials in connection with the pending motions. As the length of this Memorandum Opinion and Order indicates, the court has expended considerable time reading these papers and performing a significant amount of independent research to be as fully informed as possible when addressing the parties' arguments. While, because of the sheer volume of information presented, it is not impossible that some arguments were overlooked, the parties should assume that failure to expressly address a particular argument in this Memorandum Opinion and Order reflects the court's judgment that the argument lacked sufficient merit to warrant discussion. Accordingly, the court strongly discourages the parties from seeking reconsideration based on arguments they have previously raised or that they could have raised.

-125-